THETFORD v. MODERN WOODMEN OF AMERICA. (No. 6817.)

(Court of Civil Appeals of Texas. Austin. April 22, 1925.)

1. Death ⚙⟳2(3)—Evidence held sufficient to rebut presumption of death from absence.

Evidence held sufficient, both under the common law and under Rev. St. art. 5707, to warrant finding that a presumption of death from 7 years' absence of fugitive from justice under charge of forgery had been rebutted.

2. Death ⚙⟳1—Presumption of continuance of life rebutted by unexplained absence for 7 years.

Under Rev. St. art. 5707, the presumption of the continuance of life is rebutted by the unexplained absence of a person from his last place of abode for 7 years successively without being heard of during such period.

3. Death ⚙⟳2(1)—Presumption of death from 7 years' absence not absolute.

The presumption of death from 7 years' continued absence, raised by Rev. St. art. 5707, is not an absolute one, but is based upon probability arising from circumstances.

4. Death ⚙⟳2(1)—When finding of death is warranted.

Where the circumstances may be such as to afford an explanation for 7 years' absence of a person, which is as consistent with continuance of life as with death of the absent person, a finding of fact supporting either inference is warranted.

5. Insurance ⚙⟳800—Statute relating to claim for penalty and attorney fees held not applicable to mutual benefit associations.

Rev. St. art. 4746, relating to claim for penalty and attorney fees, in action on life policy, held not applicable to mutual benefit associations.

6. Death ⚙⟳2(3)—Indictments held admissible to rebut presumption of death from absence.

In action by beneficiary of life policy, based upon presumption of death of insured, absent for 7 years, indictments of insured for forgery prior to his disappearance, and proceedings thereunder, held properly admitted to rebut presumption of death under Rev. St. art. 5707.

7. Evidence ⚙⟳317(2) — Hearsay testimony held inadmissible to show fact of insured's being alive, or that he established home in Mississippi.

In action by beneficiary of life policy, based on presumption of death of insured because absent over 7 years, within Rev. St. art. 5707, testimony that a companion of insured had told beneficiary that he had left insured in Mississippi running a tractor held inadmissible for purpose of showing that insured was alive at time indicated, or that he established home in Mississippi; such evidence being clearly hearsay.

8. Death ⚙⟳2(1)—Party relying on presumption of death from absence not required to show absentee had not been heard of.

Under Rev. St. art. 5707, party relying on presumption of death, arising from absence of 7 years, is not required to show absent person had not been heard of.

9. Death ⚙⟳2(1)—Proof of continued absence from last-known residence necessary to raise presumption of death.

Proof of absence from former residence for 7 years does not raise a presumption of death within Rev. St. art. 5707, where such person is shown to have established residence in another state.

10. Witnesses ⚙⟳406—Evidence held admissible to discredit testimony of beneficiary that he had not heard of insured for 7 years.

In action by beneficiary, based on statutory presumption of death arising from insured's 7 years' absence within Rev. St. art. 5707, evidence that companion of insured had told plaintiff that he (witness) left insured in a certain town in Mississippi running a tractor, held admissible to discredit testimony of plaintiff that he had not heard of insured since latter left 7 years before.

11. Death ⚙⟳3—Evidence of tidings from absentee, and of no efforts to locate him, held admissible.

Evidence of tidings from person disappearing and absent 7 years, and of no efforts to lo-

---

⚙⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

cate him, is admissible, where the circumstances are such as to raise issue of his being alive, regardless of presumption of death under Rev. St. art. 5707, arising from such absence.

**12. Evidence ☞475—Not essential that witness, in giving his opinion as to identification of person, should himself be free from doubt with reference to person's identity.**

It is not essential that witness, in giving his opinion as to identification of person, should himself be free from doubt, or eliminate all doubt, with reference to person's identity.

**13. Trial ☞139(1)—Matters affecting weight of evidence are for jury's consideration.**

Matters affecting weight of evidence are for jury's consideration.

**14. Death ☞2(3)—Testimony held admissible to rebut presumption of death from absence.**

In action by beneficiary of life policy, based upon statutory presumption of death of insured arising from 7 years' absence, under Rev. St. art. 5707, testimony that witness, who had known insured for many years, met in the army a person who answered description of insured, and whom witness thought was insured, and that such person seemed to be familiar with location of railroad tracks in town from which insured came, *held* admissible to rebut presumption of death.

**15. Appeal and error ☞715(2)—Court of Civil Appeals cannot consider affidavit not properly part of record.**

Court of Civil Appeals cannot consider affidavit which is not properly part of the record.

**16. New trial ☞102(3)—Facts set up in motion for new trial held not sufficient to set aside trial court's action in overruling motion.**

Facts set up in motion for new trial, as to efforts to procure evidence pertaining to identity of insured, alleged to have been absent for 7 years, and therefore presumed dead under Rev. St. art. 5707, *held* not sufficient to reverse order overruling motion.

**17. New trial ☞97—Party surprised, by failing to withdraw announcement of readiness for trial, waives right further to investigate matter pertaining to surprise.**

Party surprised, by failing to withdraw announcement of readiness for trial, waives right further to investigate evidence pertaining to surprise.

**18. New trial ☞97—Party will not be permitted to speculate upon verdict of jury with full knowledge of status of testimony.**

Party will not be permitted to speculate upon verdict of jury with full knowledge of status of testimony, and, after an adverse verdict, be given a new trial to ascertain whether witness was mistaken in his testimony.

**19. Death ☞2(3) — Circumstantial evidence competent to rebut statutory presumption of death from absence.**

Circumstantial evidence is competent to rebut the presumption of death arising, under Rev. St. art. 5707, from absence of 7 years.

**20. Death ☞2(1)—Statutory presumption of insured's death from absence, created issue whether insured was dead.**

Statutory presumption of insured's death, arising from 7 years' absence, within Rev. St. art. 5707, raised ultimate issue whether insured was dead or alive when cause of action on policy was claimed to accrue.

**21. Death ☞2(1)—Instructions as to burden of proof to rebut presumption of death from absence held not erroneous.**

In action on life policy, predicated on statutory presumption of death from 7 years' absence, instruction that burden was on insurer to rebut presumption was proper, and there was no error in refusing to charge that burden was on insurer to prove that beneficiary was alive during time of absence.

**22. Trial ☞125(1)—Argument to jury held reversible error as appeal to passion and prejudice.**

In action on life policy, predicated on statutory presumption of death under Rev. St. art. 5707, arising from beneficiary's absence for 7 years, where beneficiary disappeared because of forgery indictments against him, argument that insured's father, beneficiary under policy, induced and encouraged son to flee, and that plaintiff deserved no consideration from jury, *held* reversible error as an appeal to passion and prejudice.

**23. Appeal and error ☞1067—Refusal to instruct to disregard improper arguments of counsel to jury held harmless.**

Refusal to instruct jury to disregard improper arguments of appellee's counsel to jury *held* harmless, where, on being challenged as to the correctness of statement made, appellee's counsel admitted his error before the jury.

**24. Appeal and error ☞1060(1)—When improper argument warrants reversal stated.**

In order to warrant a reversal for improper argument of counsel, record should show at least some substantial probability that improper argument affected jury's verdict adversely to the losing party.

Appeal from District Court, Denton County; C. R. Pearman, Judge.

Action by D. T. Thetford against the Modern Woodmen of America. Judgment for defendant, and plaintiff appeals. Reversed, and remanded for new trial.

Geo. M. Hopkins and Brent C. Jackson, both of Denton, for appellant.

Truman Plantz, of Warsaw, Ill., Geo. G. Perrin, of Rock Island, Ill., and Sullivan, Speer & Minor, of Denton, for appellee.

McCLENDON, C. J. On June 6, 1910, the appellee, a fraternal beneficiary society, issued to James Bert Thetford, to whom we will refer as Bert Thetford, a benefit certificate for $3,000, payable, on the death of Bert Thetford, to his father, the appellant herein. The application showed that Bert Thetford was born February 14, 1892. He

was not married, and lived with his father at his home in Denton county until about September 15, 1913, when he disappeared, having the month previous been indicted by the grand jury of Denton county on three bills charging forgery, and released on bail bonds. All assessments and dues under the certificate were paid up to and including the month of December, 1920, and later appellant made demand upon appellee for payment of the certificate, basing his claim that Bert Thetford was dead upon the presumption of absence for 7 years "beyond sea or elsewhere," as provided in R. S. art. 5707. Thereafter, on March 10, 1922, appellant brought this suit against appellee, seeking to recover the amount of the certificate and the statutory penalty and attorney's fees.

The cause was tried to a jury upon special issues, and, upon the jury finding that Bert Thetford was not dead at the time appellee made the demand for payment, judgment was rendered in favor of appellee. The appeal is from this judgment upon 15 assignments of error.

Assignments numbered 1, 9, 2, 15, 3, 10, 4, 5, and 12 will be first stated and considered in the order named. These assignments predicate error upon the following rulings of the trial court:

(1) In permitting appellant to testify on cross-examination that, after Bert Thetford left home in September, 1913, John Thetford came to appellant's home and stated to him that he left Bert at Blossomville, Miss., running a tractor.

(9) In refusing a special charge to the jury that this testimony "was hearsay, and was improperly admitted, and you will disregard the same in arriving at a verdict."

(2 and 15) In permitting testimony of Ray Goode to the effect that he had seen a man in 1917 in the army whom he believed to be Bert Thetford.

(3 and 10) In admitting in evidence the indictments and proceedings in connection therewith.

(4) In refusing a peremptory instruction in favor of appellant for the amount of the certificate and the statutory penalty and attorney's fees.

(5) In refusing an alternative peremptory instruction in favor of appellant for the amount of the certificate.

(12) In rendering judgment in favor of appellee upon the "legal evidence" adduced.

It will be observed that these assignments relate to the character of evidence admissible, and the sufficiency of the proof, to rebut the statutory presumption of death from 7 years' absence "beyond sea or elsewhere."

There was no controversy as to the following facts: That the certificate was issued as alleged, and all assessments and dues paid thereon up to and including December, 1920; that on September 15, 1913, Bert Thetford was 21 years old, unmarried, in good health,

and was living at his father's home in Denton county; that in August, 1913, the three indictments were returned against him; that he was arrested, released on bond, and about September 15, 1913, left home and never returned; that later his bonds were forfeited, and reward was offered for his arrest and return to the officers.

In his examination in chief, appellant testified:

"I last saw Bert Thetford about the 12th of September, 1913. I saw him at home on that day. He said he was going to Fort Worth from here. I have not seen him nor heard of him since that time. I have made inquiry concerning him. I have not heard of him since that time."

His cross-examination, which embodies the testimony objected to, reads:

"I suppose I have talked to young John Thetford. I have talked to him since Bert's disappearance. I haven't heard from Bert. As to whether I told Mr. Hopkins I had not heard from him I will state that I haven't heard from him since. I did hear John Thetford say he was in Mississippi. I did hear John Thetford, his cousin, who I say went at least as far as Argyle with him, say he was in Mississippi, running a tractor on a big plantation. I didn't advertise in any papers in Mississippi for him. I did not go back there. John Thetford told me he traded for Bert's valise, and he had Bert's valise back here, and I saw it. That was after Bert disappeared, when he was under bond for three cases of forgery. Bert got one foot mashed out here at the brickyard and was kind'a crippled."

On redirect examination, he testified:

"John Thetford made that statement to me some 4 or 5 months after Bert left; something like that; I don't know hardly how long it was. John was back here at that time. When he came back, he came to my house first. He did not make a statement to any one else as to where he was. He told me he was in Blossomville, Miss., and the letter I wrote him come back; said there wasn't any such post office. I did not get in communication with him in any way, although I tried to do so. I did not make any other effort to find him. As to what kind of a boy Bert was with reference to staying at home, I will state that he stayed at home all of the time."

We quote in full the testimony of Ray Goode, which was objected to as being insufficient to identify Serg. Parker as Bert Thetford:

"My name is Ray Goode. I am teaching school at Esteline, Tex. My wife lives in Denton, Tex. She lives with my father while I am out teaching. I am 27 years old. I have lived in Denton county about 25 years. I was acquainted with T. B. (Bert) Thetford. I knew him from the time I was 6 or 8 years old, I guess. I have lived in 3 or 4 blocks of him. He was older than I was. I knew him when he worked down at the brick plant. Along about 1917 I was in the army at San Antonio. When I left San Antonio I went to Syracuse, N. Y.

I was a private in the army. It had been several years prior to 1917 since I had seen Bert Thetford. There was a sergeant in the company I was in. This sergeant was about 6 feet tall, pretty slender, and limped in one leg. He was going under the name of Serg. Parker, but I thought it was Bert Thetford. I thought so then. That was in 1917. I said we went to Syracuse, N. Y., going from San Antonio on a troop train to that place. We came through Denton on that trip. I said I took this sergeant to be Bert Thetford. I did have a talk with this man that I took to be Bert Thetford with reference to what towns were along this line of railway, through Denton. He knew where Denton and Whitesboro were."

Cross-examination:

"I don't know where this Serg. Parker registered from—whether from 1908 Main street, Fort Worth, Tex., or not. I don't know that that was Bert Thetford, nor do I pretend to say that it was Bert Thetford. He was a man that looked like Bert Thetford. He was with the outfit in the army that I was with about 3 months I think. He knew where Denton and Whitesboro were; however, I don't see anything strange about that. There are lots of people who know where Denton and Whitesboro are. I think Whitesboro is a sort of terminal, and I think a good many people know where Denton is located. I think most any person who is intelligent enough to be a sergeant in the army would know where Denton is and where Whitesboro is. During the time I knew Serg. Parker I did not associate with him very much. We were in the same company. In coming from San Antonio through this country I rode with him part of the time. The only thing he knew was where Whitesboro was. I don't know whether he seemed to know any of the people around here or not, as that wasn't mentioned. He didn't inquire anything about the people around Denton. I suppose Bert Thetford naturally knew a great many of the old timers around here. He would have known my father. That man didn't ask me anything about my father. He didn't ask me if I was Jim Goode's boy, nor did he ask me anything about D. T. Thetford. He didn't ask me anything about any of the people who lived around Denton. He merely knew where Denton and Whitesboro were. I can't identify him as being Bert Thetford. I don't think my father was sheriff at that time.

"I said I thought this man was Bert Thetford. The only reason I had to think that was that little resemblance. I did not ask him what his name was. I could not say for sure what color his hair was, but I think that it was pretty gray; however, I would not say for sure about that. I believe his eyes were blue, but I would not say for sure about that. I don't know that I ever noticed or thought anything about his complexion. I believe he was pretty dark though. It is a fact that most of the boys who were in training were tanned up and pretty dark. The boys who came out of stores around town and went into the training camps soon got tanned up to where they were dark. I don't remember which foot that fellow was lame in, but I do remember that he was a little lame in one foot; he limped just a little. I could not say for sure what size man he was. He must have been 6 feet tall and weighed about 165

pounds I should think. He was slender in build. I would take him to be about 33 years old at that time, which was in 1917. I don't think he was younger than 33, although he could have been. I believe he was getting gray-headed. That was about May, 1917. He did not exactly seem like he was under any kind of a strain like he was on the dodge or anything of that kind. The boys in the army did have a fellowship for each other. I don't know whether we were afraid to tell each other most anything or not. As to whether or not we were afraid to trust each other with any kind of a secret, I will state that I was afraid to trust them with any kind of a secret—it depended on who it was. I judged that fellow to be about 33 years old. I don't know that I noticed him close enough to discern whether or not he had any wrinkles on his face or not, or whether he was breaking. I don't know how long he had been in the army. He was a sergeant when I went to the company. I don't know whether he was afterwards made a lieutenant or not, but I don't think he was. I don't know what became of him. I don't know what his first name was—whether it was Serg. Wallace O. Parker or not. I don't know whether he was first top sergeant of the Forty-Seventh company or not. He was transferred from the Forty-Seventh to the Ninth. I wasn't in the Forty-Seventh. I was with the Ninth. He was not top sergeant of the Ninth, he might have been, I don't know. Brashear was the fellow's name. I said I didn't know whether he lived at 1908 Main street, Fort Worth, or not—don't know whether that is the information he gave the War Department or not."

Redirect-examination:

"He knew about the joint track before we got to Denton. I asked him if I could get off when we come through Denton, and he said we would not come through Denton; that there was a joint track and we would go around by Greenville. That was the main line. I said I thought he was Bert Thetford. I wrote my father about it. I was a private, and he was a sergeant. As to whether or not I had any reason for not accusing him of being a fugitive from justice I will state that I don't believe I would hardly accuse him of being that. He was over me, which, I guess, was the main reason for me not saying anything to him about it because of the treatment I might receive from him as sergeant."

Recross-examination:

"I suppose that practically everybody living in Denton, Fort Worth, and Whitesboro knew about that joint track. Serg. Wallace O. Parker, 1908 Main street, would probably know about that. As to whether I still think that was Bert Thetford, I will state that I don't have any reason to believe it was not. I did talk to you [Mr. Hopkins] and Mr. Jackson over in the office in this regard about Christmas time, at which time I told you I wasn't sure that that was Bert Thetford. I didn't say I didn't think it was him; I said I wasn't sure. As to whether I was not disposed to appear in the case, I will state not that I know of."

Appellant testified in rebuttal that Bert was about 6 feet 2 inches tall, and "his weight ran all the way from 165 to 175

pounds. His complexion was medium dark, and one of his legs was 2 inches shorter than the other, and he limped a little;" that he had not seen him since 1913.

[1] Independently of John Thetford's statement to appellant, and of the testimony of Ray Goode, the evidence was sufficient both under the common law and under our statute to warrant a jury finding that the presumption of death from 7 years' absence had been rebutted.

[2] The common-law rule has been variously expressed, but for our present purposes it may be stated that the presumption of the continuance of life is rebutted by the unexplained absence of a person from his last or usual place of abode for 7 years successively without being heard of during such period. Our statute upon the subject reads:

"Art. 5707. Any person absenting himself beyond sea or elsewhere for seven years successively shall be presumed to be dead, in any cause wherein his death may come in question, unless proof be made that he was alive within that time." Act Feb. 5, 1841.

Under the common law:

"The presumption of death from unexplained absence is not, however, a presumption of law, but a mixed presumption of law and fact, which may be rebutted, and it will not be indulged when the circumstances of the case are such as to account for the absence of the person without assuming his death." 17 C. J. p. 1116.

Quoting further from the same volume at page 1173:

"Evidence showing a motive for the disappearance of a person is admissible to rebut the presumption of death arising from absence. Thus it may be shown that the absent person supposed to be dead was a fugitive from justice, although a general rumor that a missing person had committed a crime without stating the source of the rumor is not admissible to explain his disappearance."

The following is from 8 R. C. L. p. 713:

"The presumption of death, arising from the absence of a person from his home, unheard from for the period of 7 years, may be rebutted by counter proof or by a conflicting presumption, and the burden of the rebuttal is on the party denying the death of the absentee. The presumption may be rebutted by evidence sufficient to satisfy the jury that he has been heard from within that time, and it is not necessary to produce persons who have seen him or to produce letters received from him within that period. * * * The financial condition of the absentee, or that he was a speculator or visionary in his business, is all proper evidence to be considered by the jury in determining the fact of death or life. The fact that the absent person is a fugitive from justice, while it does not prevent the presumption from arising, is admissible to rebut the presumption of death, and it is rebutted by a showing that the fugitive has been seen, that there are rumors as to his whereabouts, and that he absented himself when a warrant was issued for his arrest. When a presumption of death has been raised, the jury must determine, under proper instructions, what quantity of evidence will outweigh it and the credibility of such evidence."

[3, 4] To rebut the presumption of death from 7 years' absence, our statute requires proof that the person was alive during that time. The character of proof is not prescribed; hence it should follow that the proof should be of such a nature as to warrant an inference contrary to that which the statute draws from the fact of 7 years' continued absence. The presumption of death from 7 years' continued absence is not an absolute one. It is based upon probability arising from circumstances. The circumstances may be such as to sustain a finding of death from absence much shorter than the statutory period. This is so when they are of such nature as to preclude the reasonable hypothesis that the person is still alive. Woodmen v. Robinson (Tex. Civ. App.) 187 S. W. 215; K. of P. v. Wilson (Tex. Civ. App.) 204 S. W. 891; Woodmen v. Piper (Tex. Civ. App.) 222 S. W. 649. Conversely, the circumstances may be such as to afford an explanation for such absence, though the 7-year period has been exceeded, which is as consistent with continuance of life as with death of the absent person. In such cases a finding of fact supporting either inference is warranted. This rule was applied in Barrios v. State, 83 Tex. Civ. App. 548, 204 S. W. 326, where the absent person had killed his wife's father and fled to Mexico. The Court of Criminal Appeals, speaking through Judge Morrow, say:

"The statute in question, in terms, makes the presumption rebuttable when it says, 'unless proof be made that he was alive within that time.'"

In the Kentucky case of Insurance Co. v. Martin, 108 Ky. 11, 55 S. W. 694, the same conclusion was reached under a statute substantially the same as ours as regards the question at issue. The statute there raised the presumption of death from a person's continued absence for 7 years, "unless proof be made that he was alive within that time." The question arose in a suit upon an insurance policy issued upon the life of James W. Tate, who left the state and had not been heard from for a period of over 7 years. At the time he left the state, Tate was 57 years old, and had a wife and several children. He was treasurer of the state, and had embezzled a large amount of state funds. He wrote several letters to his wife from different places in this country and abroad, and finally his letters ceased, and nothing more was heard of him. We quote from the opinion:

"When the plaintiff shows that a resident of the state has been absent seven successive years from the time he left, or from the time he was

last heard from, the burden of proof shifts to the defendant to overcome the presumption of his death. This proof may be direct, or it may be circumstantial, arising from the circumstances under which the person left, his reasons for leaving, or concealing his whereabouts, his age, condition of health, his motives for not returning or keeping in communication with his home, and the like. In this case it was a question for the jury, on all the evidence, whether the assured, J. W. Tate, was alive or dead when the action was brought."

The facts at bar present a somewhat stronger case of rebuttal of the presumption than the Kentucky case. There the absent person was 57 years old, and left behind a wife and children, with the former of whom he communicated for a time, when suddenly all communication ceased, and all trace of him was lost; whereas here the absent person was only 21 years of age, was unmarried and in good health, and never communicated with those at home. He had just been released from jail under bonds given under three indictments charging felonies. There were the strongest reasons for his continued absence and for concealing his whereabouts and his identity. If circumstantial evidence alone is ever competent to show that the absent person is alive during the 7-year period, the facts in evidence present such case.

[5, 6] R. S. art. 4746, relied upon by appellant in support of his claim for penalty and attorney's fees, has no application to mutual benefit associations. Woodmen v. Downer (Tex. Civ. App.) 241 S. W. 228. It follows, from what has been said above, that the indictments and proceedings thereunder were properly admitted in evidence.

[7] The statement of John Thetford to appellant, to the effect that he left Bert Thetford in Blossomville, Miss., running a tractor was not, we think, admissible, either as evidence that Bert Thetford was alive at the time indicated in the statement or as tending to show, if it did so tend, that he established a home in Mississippi; and an instruction to that effect would have been improperly refused. As proof of such facts, it was clearly hearsay and inadmissible under our statute. In Nehring v. McMurrian, 94 Tex. 45, 57 S. W. 943, the Supreme Court, speaking through Judge Williams, say:

"In inquiries concerning a person who has disappeared, for the purpose of determining whether or not his death should be presumed, evidence that he has not been heard from is admissible to show the state of facts out of which such presumption may arise; and, on the other hand, evidence that he has been heard from has often been admitted to exclude the presumption. Prudential Association v. Edmonds, 2 L. R. App. Cases, 487; Norris v. Edwards, 90 N. C. 382; Keech v. Rinehart, 10 Pa. St. 240; Dowd v. Watson, 105 N. C. 476; Smith v. Smith, 49 Ala. 156; Flynn v. Coffee, 12 Allen, 133. In cases where this character of evidence is admitted, the fact to be proved is that the party has not been heard

from, and evidence that he has or has not is therefore not considered to be within the rule which excludes hearsay evidence. Our statute (article 3372) is so worded, however, as to make it somewhat questionable whether or not the same rules of evidence apply under it as are recognized where the rule upon which the presumption of death arises is differently expressed, as it is in most of the decisions which we have examined. French v. McGinnis, 69 Tex. 19; Smothers v. Mudd, 9 B. Mon. 490; Smith v. Smith, 5 N. J. Eq. 484; Wambough v. Schenck, 2 N. J. L. 388; Osborn v. Allen, 26 N. J. L. 388; Hoyt v. Newbold, 16 Vroom, 219; same case, 46 Am. Rep. 757."

In the Kentucky case cited, the evidence in question consisted of reports of two or three persons to others that they had seen the absent person. The court say:

"We are also of opinion that the court ought to have excluded the hearsay statements of the witnesses as to Snelling. The statute of 1798 (1 Dig. 544) enacts that any person absenting himself beyond sea, or elsewhere for seven years successively shall be presumed to be dead, in any case wherein his death shall come in question, unless proof be made that he was alive in that time. The proof shows that Snelling had been absent for more than seven years from this state, the country of his residence, and not having been heard from was supposed to be dead. After the lapse of twelve years, some two or three persons report to others, that they had seen him alive. Such information certainly cannot be regarded 'as proof that he was alive.' It would be very dangerous to the rights of litigants, to permit such mere hearsay statements to be used in evidence. The court should have excluded them, and should also have refused the defendant's instruction No. 13, which was based upon that proof."

[8] In the other cases cited the question does not appear to have been involved. Hearsay evidence has been held admissible to prove, or as tending to prove, death. Primm v. Stewart, 7 Tex. 178; York v. Hilger (Tex. Civ. App.) 84 S. W. 1117; McDoel v. Jordan (Tex. Civ. App.) 151 S. W. 1178. But it does not follow that proof that a party was alive, as required by our statute, may be so made. Statements of the character in question are held admissible under the common-law presumption, not as hearsay, but because the fact there required to be shown, to raise the presumption of death, is 7 years' absence without tidings. Under our statute it is not incumbent upon the party relying upon the presumption to show that the absent person had not been heard of. French v. McGinnis, 69 Tex. 19, 9 S. W. 323. This distinction between our statute and the common law was probably not in the mind of Prof. Wigmore when he wrote the following: "The doubt expressed in Nehring v. McMurrian was unnecessary." Ev. § 2531, note 7. We do not find that this eminent writer refers to the Kentucky case (Smothers v. Mudd, 9 B. Mon. 490) cited by Judge Williams.

[9] Under both the common law and our statute, the absence relied upon must be from the last residence of the person, and, where it is shown that he established a residence in another state, proof of absence from his former residence does not raise the presumption. State v. Teulon, 41 Tex. 249; Stiles v. Hawkins (Tex. Com. App.) 207 S. W. 89; Turner v. Sealock, 21 Tex. Civ. App. 594, 54 S. W. 358; Latham v. Tombs, 32 Tex. Civ. App. 270, 73 S. W. 1060. It may be questioned whether the statement was sufficient, without corroboration, as tending to show that Bert Thetford had established a residence in Mississippi. But, if it was, it was clearly hearsay, and not admissible for that purpose.

[10, 11] The evidence was admissible, however, as tending to discredit the testimony of appellant to the effect that he had never heard of Bert since he left home. Under the facts of this case, it was also admissible for another purpose. The circumstances surrounding Bert Thetford's disappearance from home being such as to raise the issue of his being alive, regardless of the presumption arising from his absence, it was competent to show what, if any tidings, and from what sources, had come to his relations, and what, if any, efforts they had made to locate him. The objection to the testimony was properly overruled; and, since the special charge would have withdrawn it from the jury for every purpose, it was properly refused.

[12, 13] We also think the testimony of Ray Goode was admissible for whatever the jury might consider its value as proof that the witness had in fact seen Bert Thetford in 1917; the latter being then in the army under the assumed name of Parker. It is true the witness was not willing to positively identify the Serg. Parker whom he met in the army at Thetford, and that there was some doubt in his mind as to the correctness of his opinion that it was Thetford whom he saw. But identity is largely a question of opinion, and it is not essential that the witness, in giving his opinion, should himself be free from doubt, or should eliminate all doubt with reference to the person's identity. The liability of mistake would exist even where he was positive in his assertion that he recognized the person in question. The degree of uncertainty with reference to his testimony, and the extent of possibility or even probability of mistake, are matters which affect the weight of the evidence and not its admissibility —matters peculiarly within the province of jurors who are as well qualified to pass upon them as a court or any one else. We have not found a case in which the effect of this character of testimony in a civil suit has been passed upon, but in criminal cases the question frequently arises, and the courts uniformly give a very wide latitude to the jury in determining whether or not a person charged with crime has been identified by some witness who recognized him, thought he recognized him, or testified to some feature, attribute, characteristic, or even to matters of dress, voice, etc. Texas cases upon this subject are collated in 6 Texas-Southwestern Digest Criminal Law, Key Number 453. Corpus Juris lays down the following rules upon this subject as applied by the courts in criminal matters:

"Provided he bases his testimony on his own knowledge and not on information furnished by another, the opinion, belief, judgment, or impression of an ordinary witness as to the identity of a person or an object is competent evidence." 16 Corpus Juris, § 1573.

"Identity need not be positive and certain; it is enough for him to testify that his belief, opinion, impression, or judgment is that accused is the person whom he saw commit the crime. The indefiniteness and uncertainty affect the weight rather than the admissibility of the testimony." 16 Corpus Juris, § 1050.

In Andrews v. State (Tex. Cr. App.) 83 S. W. 188, Presiding Judge Davidson uses the following language:

"Objection was urged that this evidence did not identify defendant as being the negro seen by the witness. While this identification or attempted identification is not very satisfactory, yet this would not exclude the testimony. This goes more to its weight than admissibility."

[14] The evidence of Goode was that he had lived 25 years in Denton county; he was very near the same age as Bert Thetford, and lived 3 or 4 blocks from him; had known him from the time he was 6 or 8 years old. He described his physical appearance and that he limped in one leg, which latter description accorded with that conceded by the father. He served in the same company with Serg. Parker, and talked with him while on the train. Parker was apparently familiar with the country through which they were riding, which was in the vicinity of Denton. The witness believed at the time that Parker was Thetford, and saw no reason to change his opinion. He had written his father about the circumstance at the time. We think the evidence was such as to warrant its submission to the jury, and that the court did not commit error in admitting it. It was certainly no weaker than that adduced in the English case of Assurance Co. v. Edmonds, 2 L. R. App. Cas. 487, the admissibility of which, while not raised, was conceded by all the judges who sat in the case.

In motion for new trial, the plaintiff asserts that he has been searching for the Serg. Parker referred to, and has been advised by the War Department that he was Wallis O. Parker, who gave his enlistment address as 208½ Main street, Argenta, Ark., and as persons to be notified his wife, Mrs. Wallis O. Parker, 501 E. Third street,

Fort Worth, and brother, Forrest C. Parker, with the Postal Telegraph Company, Houston, Tex.; that plaintiff's attorney had written all these' addresses, and had been advised' by the telegraph company that at last accounts Wallis O. Parker was employed by some oil company in Tampico, Mexico; that the plaintiff has not had time since the trial of the case to get in touch with said Wallis O. Parker, but'had reason to believe that he could locate and get in touch with him and establish the fact that Goode was mistaken in believing that Serg. Parker was Bert Thetford. It was further alleged that at the first opportunity- after Ray Goode was subpœnaed as a witness plaintiff's attorneys had talked with him about Parker, and were advised that he could not identify him as Bert Thetford,. but nevertheless they immediately took steps to locate Parker and obtained the information above shown.

[15-18] Plaintiffs have also filed an affidavit made on December 5, 1924, by Wallis O. Parker, before a notary public in Harris county, Tex., in which affiant identifies himself as the Serg. Parker testified to by Goode, and gives other facts regarding himself, showing that he is not the same party as Bert Thetford. The affidavit, of course, cannot be considered on appeal for any purpose. The facts set up in the motion for a new trial are not sufficient to justify setting aside the trial court's action in overruling the motion. It does not appear from the motion what portions of the information were obtained before the trial and what afterwards but it clearly appears that plaintiffs were apprised before the trial of what Goode's testimony would be, and had the data from which they could have obtained all the information contained in the motion for new trial and in the affidavit presented to this court. Plaintiff did not claim surprise at the testimony of Goode, and did not ask for further time to investigate with reference to Serg. Parker, so as to determine whether or not he were the same person as Bert Thetford. Plaintiff's announcement of ready for trial was without qualification, and he took the chance of whatever effect might be given to Goode's testimony. If his testimony upon the trial was substantially different from what he had told plaintiff's attorneys, and they were induced to announce ready upon his former statement to them, it was the duty of plaintiff to claim surprise at the time, and ask permission to withdraw his announcement of ready, in the absence of which course he waived his right for further investigation, and cannot complain except as to the legal admissibility of the evidence. A party will not be permitted to speculate upon the verdict of a jury with full knowledge of the status of the testimony, and, after an ad-

273 S.W.—43

verse verdict, be given a new trial for the purpose of further investigation to ascertain whether the witness has been mistaken in his testimony. Since we have reached the conclusion that the trial court's judgment must be reversed upon another ground, the question of identity of Serg. Parker as Bert Thetford may be cleared up, and the whole matter become unimportant, or else conclusive of the issues in the case.

Assignments numbered 6, 7, 8, and 11 complain of the charge of the court and the refusal of special charges. 'The pertinent portions of the court's charge follow:

"Our statute provides that any person absenting himself beyond the sea or elsewhere 7 years successively shall be presumed to be dead, in any cause wherein his death may come in question, unless proof be made that he was alive within that time. But you are charged that such presumption may be rebutted by proof, and the burden of this proof is on the defendant, and the jury, in considering the issues hereinafter submitted, should consider, in connection with the presumption, all the facts and circumstances shown by the evidence attending the departure of the assured, and the reasons for his absence, if any, and his motives for not returning or keeping in communication with his home, if any. Now, bearing in mind the foregoing instructions, you are asked: (1) Was J. B. Thetford, the assured, dead at the time of the demand by the plaintiff of the defendant for the payment of the benefit certificate sued upon herein? Answer 'Yes' or 'No.'"

Plaintiff also requested the following special instruction, ·which was refused:

"You are instructed that under our statute a person who is absent from home for a period of 7 years successively, without proof that he was alive during the time, is presumed to be dead, and you are therefore instructed that, if the said James Bert Thetford was absent from home for a period of 7 years prior to March 1, 1921, then the burden is upon the defendant to prove by a preponderance of the evidence that he was alive within that time, and, if it has failed to do so, you are instructed to answer the first question contained in the court's charge 'Yes.'"

Plaintiff also presented a complete special issue charge, but, since its refusal involves the same issues as those involved in the objections to the court's charge and the refusal of the above special charge, it is not necessary that it be quoted.

Stated generally, the contentions of plaintiff are, first, that the issue for the jury to determine was not whether the assured was dead, but whether the statutory facts existed which would raise the presumption of his death without proof that he was alive during that time; and, second, that the charge of the court did not properly place upon the defendant the burden of proof required to rebut the presumption that the assured was dead during the 7 years' period of absence.

[19, 20] There is no merit in the contention that the special issue submitted to the jury was improper. The ultimate fact, and only fact to be determined was whether Bert Thetford was dead before the certificate, but for his death, would have lapsed. The presumption which the statute raises from 7 years' absence was but evidence of this fact. It was proper for the court to charge the jury upon the law in that regard, and also to charge them that the presumption thus raised might be rebutted by circumstantial evidence. The ultimate issue of fact, however, which the case presented, was whether Bert Thetford was dead or alive when the cause of action was claimed to accrue, and that issue was properly submitted to the jury. In the Martin Case this very question was involved and decided adversely to appellant's contention. We quote from the opinion:

"The court instructed the jury as follows: 'If the jury believe from the testimony that the insured, J. W. Tate, while a resident of and living in Franklin county, Kentucky, left the state of Kentucky on the 16th day of March, 1888, and that for seven years continuously from the 3d day of December, 1888, nor since that time, has returned to the state or been heard from since December, 1888, they ought to find for the plaintiff.' The law presumes one dead who departs from the state, and is gone for seven consecutive years without returning, and has not been heard from since he left, unless it be shown that he has returned to the state or been heard from within that time, or at any time since, or that he was alive during that time.' By these instructions the jury were, in terms, told to find for appellee if Tate had been absent from the state for seven years without being heard from since December, 1888. The question of whether he was in fact alive or dead was not submitted to the jury, nor were they authorized, by these instructions, to find for the appellant if they did not in fact believe him dead. Instead of the instruction we have quoted, the court should have told the jury that they ought to find for the plaintiff if they believed from all the evidence that Tate was dead on June 30, 1897; otherwise, for the defendant. The court should also have told them that if Tate, while a resident of Franklin county, Ky., left the state of Kentucky on March 16, 1888, and that for seven years continuously from December, 1888, he had not returned to the state or been heard from, the law presumed him dead, unless it was shown that he was alive within that time; but that such presumption (like that of innocence or sanity) might be rebutted by the proof, and that the jury should consider, in connection with this presumption, all the circumstances shown by the evidence attending the departure of Tate, and the reasons for his absence, if any; and it was a question for them to determine on all the evidence whether Tate was alive or dead when the suit was filed."

[21] The question whether the trial court properly instructed the jury as to the burden of proving whether Bert Thetford was alive during the 7 years of his absence arises upon refusal of the special issue above quoted. It will be noted that in the court's charge "the burden of proof is on the defendant to rebut the presumption"; whereas, in the requested special issue "the burden of proof is on the defendant to prove by a preponderance of the evidence that he was alive during that time."

In the first quotation above from the Martin Case the rule is announced that, when the requisite facts are shown to raise the presumption of death, the "burden of proof shifts to the defendant to overcome the presumption," and the same rule is announced in a number of other cases. But in none of them is the particular question, which the refusal of the special issue raises, discussed. We quote from a note upon the subject in L. R. A. 1915B, p. 744:

"Although no cases have been found within the scope of the present note which observe the distinction between the presumption of death and the burden of proof as to the issue of death, it would seem that, according to the modern view of the relation between presumption and burden of proof (see 4 Wigmore, Ev. § 2485 et seq.), the burden of proof in the sense of the risk of nonpersuasion of the jury, to employ Prof. Wigmore's phrase, remains throughout upon the party whose substantive rights depend upon the fact of the death of the person in question, and that the burden of proof in this sense does not shift as the result of the presumption of death, although the presumption does make it incumbent on the adverse party to go forward with the proof and introduce some evidence tending to rebut the presumption. The practical bearing of the distinction lies in the possibility that the minds of the jury may, as a result of the evidence as a whole, be left in a state of equilibrium on the issue of death; in which event, according to the modern view, the party whose substantive rights depend upon the fact of death must fail, notwithstanding the original presumption in his favor. This modern view has been discussed in its relation to the rule res ipsa loquitur in the note to Cleveland, C. C. & St. L. R. Co. v. Hadley, 16 L. R. A. (N. S.) 527. It may be noted here that this view as regards res ipsa loquitur has recently been sanctioned by the United States Supreme Court in Sweeney v. Erving, 228 U. S. 233, 57 L. Ed. 815, 33 Sup. Ct. Rep. 416. The view is discussed in its relation to negligence in bailment cases in the note to Stone v. Case, 43 L. R. A. (N. S.) 1168, and in its relation to insanity in criminal cases in the note to Adair v. State, 44 L. R. A. (N. S.) 119, 121. The point may, of course, be presented in any case where there is evidence tending to overcome a rebuttal presumption."

From the note referred to in 16 L. R. A. (N. S.) p. 527, we read:

"There are almost numberless cases in which the courts have expressed their understanding of the effect of the rule res ipsa loquitur by the formula that an accident to which the rule applies creates a presumption of negligence and casts upon the defendant the burden of proof, without explaining or in any way qualifying the phrase 'burden of proof.' Even when both

formulas were not employed in a complementary sense the courts were formerly quite as apt to express the effect of the rule res ipsa loquitur by the statement that the burden of proof was or was not cast upon the defendant, according as the rule was deemed applicable or not, as by the statement that the accident did or did not create a presumption of negligence. As subsequently shown, an instruction in the first or complementary form is not generally deemed erroneous, or at least not so erroneous as to require a reversal, even by the courts which expressly recognize the distinction between presumption of negligence and burden of proof, if it is clear from the charge as a whole that the phrase 'burden of proof' was used merely in the sense of making it incumbent upon defendant to introduce evidence to meet the presumption of negligence which arises in favor of the plaintiff by proof of the accident, and not in the sense of requiring defendant to meet that presumption by a preponderance of evidence establishing its freedom from negligence. While it does not seem probable that the courts in those cases consciously used the phrase in this restricted sense, and the impression left by the majority of the cases is that the courts regarded the proposition that the accident creates a presumption of negligence, and the proposition that the accident casts the burden of proof upon the defendant, as equivalent or at least complementary propositions, it is nevertheless true that few, if any, courts which have expressly considered the question have denied the technical validity of the distinction, or disputed the theoretical soundness of the position taken in cases like Kay v. Metropolitan Street R. Co., 163 N. Y. 447, 57 N. E. 751, that the presumption which arises in favor of the plaintiff, in a case to which the doctrine of res ipsa loquitur applies, does not cast upon the defendant the burden of proof in the sense that the defendant is bound to establish freedom from negligence by a preponderance of evidence. The distinction and grounds upon which this position rests, and its practical effect, are perhaps as clearly stated in that case as in any case that can be found. The court there says: 'The plaintiff upon the issue of negligence had to meet the burden of proof at every stage of the case. When a party alleges the existence of a fact as the basis of a cause of action or defense, the burden is always upon the party who alleges the fact to establish it by proof. The onus probandi is upon him throughout. In the case at bar the plaintiff made out her cause of action prima facie by the aid of a legal presumption, but when the proof was all in, the burden of proof had not shifted, but was still upon the plaintiff. The charge of the learned trial judge had reference to the case when all the proof on both sides had been given. If the defendant's proof operated to rebut the presumption upon which the plaintiff relied, or if it left the essential fact of negligence in doubt and uncertainty, the party who made that allegation should suffer, and not her adversary. The jury were bound to put the facts and circumstances proved by the defendant into the scale against the presumption upon which the plaintiff relied; and in determining the weight to be given to the former as against the latter they were bound to apply the rule that the burden of proof was upon the plaintiff. If, upon the whole, the scale did not preponderate in favor of the presumption and against defendant's proof, the plaintiff had not made out her case, since she had failed to meet and overcome the burden of proof.' "

We can see no distinction in principle between the presumption of death from 7 years' absence and the presumption of negligence from a given state of facts under the doctrine of res ipsa loquitur. In the former the fact to be established is the death of a person, in the latter it is the negligence of defendant. In each case the burden of proof to establish such fact rests upon the party asserting it. We are in accord with the reasoning set forth in the two notes above quoted from. It will be observed that, although in the Martin Case the court uses the expression that the "burden of proof" rests on defendant to show that the absent person was alive during the 7-year period, yet, in directing the lower court as to the proper charge to be given, it was not intimated that such fact must be established by a preponderance of evidence, thus clearly indicating that "burden of proof" was not intended in that sense. The trial court very closely followed the direction in the Martin Case, and, for the reasons stated, we overrule the assignments in question.

[22] By the thirteenth assignment of error plaintiff complains of the following argument by one of defendant's counsel before the jury, on the ground that it was improper and calculated to prejudice the plaintiff in the minds of the jury, and was not supported by testimony:

"This plaintiff, the father of a fugitive from justice, is seeking to take advantage of his own wrong. When Bert Thetford packed his suit case and left, he [meaning plaintiff] did not ask his son to remain, but induced and encouraged his own son to flee from the officers of the law, and he induced and encouraged his son to become a fugitive from justice, and became a party to the crime, and, gentlemen of the jury, such a man deserves no consideration at your hands, and you ought to find a verdict for the defendant in this case."

Each of the objections made to this argument was valid, and should have been sustained. There was no testimony, so far as the record shows, that plaintiff induced or encouraged his son to flee from the officers of the law, or that he was a party to his son's crime. But, even had there been such testimony, the argument was improper as an appeal to passion and prejudice. The statement that "such a man deserves no consideration at your hands, and you ought to find a verdict for the defendant in this case," is clearly susceptible of but one construction; namely, that, regardless of the merits of the controversy, regardless of all facts and circumstances which might establish plaintiff's legal right to recover, and

of what the jury might believe concerning such facts and circumstances, the jury, disregarding all such ·matters and all evidence in reference thereto, should find for the defendant because plaintiff was a bad man, that is, that he was a party to his son's crime, in that he had assisted him in escaping the punishment which the law might mete out. to him. That such argument is improper and prejudicial is manifest, and requires no argument to establish it as being such. We sustain the assignment of error, which ruling requires a reversal of the case.

[23, 24] The fourteenth assignment of error complains of the action of the court in refusing to instruct the jury not to consider the following argument by defendant's counsel: "Why don't they [meaning plaintiff] bring the mother of James Thetford and let her testify here?" and upon objection being made by counsel for plaintiff, said attorney continued: "I saw her and his sisters here yesterday; I saw you talking to them in the hall." The objection made to the argument at the time was that the statements were outside the record, were untrue in fact, and were calculated to prejudice plaintiff's right before the jury; that the mother of assured was dead, and he had no sister in attendance upon the trial. The qualification which the judge made to the bill preserving these objections was that, during the colloquy between counsel for plaintiff and defendant regarding this statement, and after plaintiff's counsel had stated that assured's mother was dead and his sister was not there, defendant's counsel stated the following, in substance: "Then I am in error. I saw some women here, and I thought it was the mother and sister of Bert Thetford. Of course, the jury will disregard my remarks in respect to them." All of which statements were made in the presence of the jury. Although the original statement made by defendant's counsel was improper, the matters therein stated being entirely outside the record, the last-quoted statement, in which he retracted the original statement, and, in substance, requested the jury to disregard it, in our opinion relieved the incident from any deleterious effect so far as plaintiff was concerned. While it would have been proper for the court also to have instructed the jury to disregard the improper remarks, still failure to do so under the circumstances, and especially in view of the fact that defendant's counsel had already in substance made the same request was not reversible error. In order to warrant a reversal for improper argument of counsel, the record should show at least some substantial probability that the improper argument affected, adversely to the losing party, the jury's verdict. Rightly disposed jurymen would not be influenced in favor of the defendant or against the plaintiff by a statement made by defendant's counsel, which, upon being challenged as to its correctness, he promptly withdrew, admitting his error, and requested the jury not to consider. The natural thing to be expected of fair-minded men under such circumstances would be to disregard the statement altogether. There would be much more reason to presume that the jury would resent this character of argument, and penalize the party making it, than be influenced favorably to such party thereby. For these reasons, we hold that the error of the trial court, if any, in refusing to instruct the jury to disregard the argument, was harmless, and overrule the assignment.

For the error pointed out, the judgment of the trial court is reversed, and the cause remanded to that court for a new trial.

Reversed and remanded.

BLAIR, J., being recused, did not sit in this case.