STILES et al. v. HAWKINS et al.
(No. 14–2591.)

(Commission of Appeals of Texas, Section B. Dec. 21, 1918.)

1. HUSBAND AND WIFE ⬡⟞252—COMMUNITY PROPERTY—PUBLIC LANDS.

Whether public land purchased from the state is community or separate property is determinable by the character of the right by which the title thereto had its inception.

2. HUSBAND AND WIFE ⬡⟞252—COMMUNITY PROPERTY—INCEPTION OF TITLE.

Where settlers on land, who had had the land surveyed but had not made the payments of 50 cents an acre under Act Aug. 26, 1856 (Acts 6th Leg. c. 128), assigned their interest to a then unmarried man, who, after subsequently marrying, made the payments and received patents for the land, the land became his separate property, subject to the right of the community for reimbursement for community funds used in completing the payments.

3. PUBLIC LANDS ⬡⟞178(1) — PRE-EMPTION LAWS—ACQUISITION OF INTERESTS.

Under the Pre-emption Law, actual settlers acquired a valuable right to their claims of such a character as to be subject of contract and assignment.

4. PUBLIC LANDS ⬡⟞172(2) — POWER OF STATE—RIGHTS OF SQUATTERS.

Where the state reserves land for railroad purposes, and, upon the failure of the railroad, reopens the land to settlement, it is within the power of the state to say whether and what consideration shall be given those who have settled on the land during the period of reservation.

5. EXECUTORS AND ADMINISTRATORS ⬡⟞439 —ACTION CONCERNING LAND—PARTIES.

·In trespass to try title brought by heirs of owner against his widow's devisees, it was not error to refuse to join the executors under the

widow's will; such executors having no interest in the property.

**6. TENANCY IN COMMON ⟖15(10)—ADVERSE POSSESSION—REPUDIATION OF TITLE OF CO-TENANT—LIMITATIONS.**

The possession of a cotenant, or tenant in common, will be presumed to be in right of the common title, and he will not be permitted to claim protection of the statute of limitations unless it clearly appears that he has repudiated his cotenant's title and is holding adversely thereto.

**7. TENANCY IN COMMON ·⟖15(7, 8) — USES OF COTENANT—ADVERSE POSSESSION—NO-TICE.**

Acts relied on by a tenant in common in showing an ouster of his cotenant, and assertion of adverse claims, must be more certain and unequivocal in character than is necessary in ordinary cases where no privity of estate exists, and notice of the adverse holding must be brought home to the cotenant either by information or by acts of unequivocal notoriety.

**8. PUBLIC LANDS ⟖174 — LAND CERTIFI-CATES—FIELD NOTES.**

In trespass to try title, brought by the heirs of the owner of realty against the devisees of the owner's widow, field notes from records of the county surveyor were admissible to show the fact and date of the surveys by the original owner and the certificate or right under which they were made, although Pre-emption Act did not require the field notes to be recorded in the county, but merely returned to the land office.

**9. WITNESSES ⟖149(2) — CONVERSATIONS WITH DECEASED PERSONS.**

In trespass to try title by the heirs of the owner against the widow's devisees, plaintiff's testimony as to conversations with widow were not inadmissible under Rev. St. 1911, art. 3690; her executors not being necessary parties to the suit, and the inhibition of the statute merely applying to personal representatives or heirs.

**10. DEATH ⟖2(1)—PRESUMPTION.**

Where the evidence shows that a man was unmarried and had removed from the state many years ago and has not been heard from for 15 years, such facts are insufficient to raise presumption of death under Rev. St. 1911, art. 5707.

**11. EXECUTORS AND ADMINISTRATORS ⟖129(1)—REAL ESTATE—RECOVERY AS AGAINST EXECUTOR.**

In trespass to try title, a judgment against a defendant in possession as plaintiff's cotenant, whether considered as a devisee or as one whose interest as executor extended to only part of the land, was proper.

**12. TRESPASS TO TRY TITLE ⟖53—RENTS—PERSONS LIABLE.**

One who has never been in possession of property, the subject of suit for trespass to try title, and has never collected or received any of the rents, is not personally liable to plaintiff for rent.

Error to Court of Civil Appeals of Third Supreme Judicial District.

Action by Sam Stiles and others against B. F. Hawkins and others. A judgment for plaintiffs was reversed by the Court of Civil Appeals (158 S. W. 1011), and plaintiffs bring error. Judgment of Court of Civil Appeals reversed, and judgment of trial court reformed and affirmed by the Supreme Court as recommended by the Commission of Appeals.

Supple & Harding, of Waxahachie, and Langford & Chesley, of Hamilton, for plaintiffs in error.

S. C. Padelford, of Cleburne, and G. C. Groce, of Waxahachie, for defendants in error.

McCLENDON, J. Plaintiffs in error brought this suit in trespass to try title against defendants in error to recover a one-half undivided interest in two surveys in Ellis county of 160 acres each, and for partition. The main question for our determination is whether the land involved was the separate property of George Stiles or the community property of George and Zilpah Stiles. Defendants in error are devisees under the will of Zilpah Stiles, and plaintiffs in error are the heirs at law of George Stiles.

The land sued for was a part of the Mississippi & Pacific Railroad reserve. It was surveyed on April 2, 1857, one survey for W. W. Rawls, and the other for J. T. Rawls. On January 25, 1858, W. W. Rawls conveyed his survey to George Stiles for $200 cash. J. T. Rawls conveyed to James Smith on January 12, 1858, and the latter conveyed to George Stiles for $330 on September 7, 1858. George and Zilpah Stiles married on November 25, 1858. On September 10, 1859, George Stiles paid at the land office $162 to cover patent fees and amount due the state of 50 cents per acre on the two surveys, and patents were issued to him as assignee of his grantors; the patents being dated September 13, and November 23, respectively, 1859, and reciting that the grants were made "by virtue of an act to authorize the location, sale and settlement of the Mississippi & Pacific Railroad reserve passed on the 26th day of August 1856." George and Zilpah Stiles lived on the land until the death of the former in 1886. Zilpah Stiles continued to live upon the land after the death of her husband until about 1890, when she moved to Cleburne and later to Missouri. She married a man by the name of Mullins about 1888. From the time of George Stiles' death until her death on December 13, 1909, she had possession of the land either in person or through tenants, cultivating it, collecting the rents, paying the taxes, and making some improvements, all of which were of a minor nature, except that about two years before her death she constructed a barn at a cost of about $600 to replace one that had burned.

---

⟖For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The evidence showed that Mrs. Stiles visited Sam Stiles, one of the plaintiffs, and a brother of George Stiles, about twice a year for several years after the death of her husband; and Sam Stiles testified to a conversation between him and Mrs. Stiles, the effect of which, if true, amounted at least to a permissive use of the property by Mrs. Stiles during her lifetime. A similar conversation was testified to by one of the other plaintiffs. This suit was filed on January 27, 1910. Zilpah Stiles by will devised the land in controversy to the defendants and named as executors B. F. Hawkins and Larkin Newton. The will was filed for probate on February 2, 1910, and admitted to probate March 24, 1910, and the executors then qualified. The latter went into possession of the land and collected the rents up to the time of the trial. There were no debts except funeral expenses, and these had been paid when the cause was tried in October, 1911. The defendants answered by general denial, plea of not guilty, and specially pleaded the statutes of limitation of three, four, five, and ten years. They also, by appropriate pleadings, sought to have the executors made parties to the suit, which was denied. The cause was tried before a jury, and the court peremptorily instructed the jury that the land was the separate property of George Stiles, and on his death, there being no children, passed one-half to plaintiffs and one-half to Zilpah Stiles. The questions of limitation and rents were submitted to the jury, and upon their finding, in favor of the plaintiffs, judgment was rendered for plaintiffs for one-half of the land and one-half of the rents collected by the executors; and commissioners to partition the land were appointed. From this judgment, defendants appealed to the Court of Civil Appeals. That court reversed the judgment of the trial court and rendered judgment for the defendants for all of the land, holding that the property was the community property of George and Zilpah Stiles. One of the judges of the Court of Civil Appeals dissented. 158 S. W. 1011, 1015, 1021, 1025.

[1] Whether the land was the separate property of George Stiles or the community property of himself and wife is dependent upon the question as to whether the title had its inception in the conveyances to George Stiles or in the payment of the 50 cents per acre required to be paid to the state before patents could issue. Judge Hawkins states the general rule as follows:

"In a controversy like this, to which the state is not a party, involving an issue as to whether public land purchased from the state in the name of either husband or wife is community property or separate property, the status of the property must be determined by the character of the right by which the title thereto had its inception. Such, it seems, was the rule under the Spanish law; such has been the rule under the Revised Civil Code of Louisiana, in which state the community system prevails; and such is the rule under the statutes and decisions of this state." McClintic v. Midland Grocery Co., 106 Tex. 35, 154 S. W. 1158.

[2] In order to determine that question, it becomes material to examine the statutes under which the surveys were made. On December 21, 1853, the Legislature passed an act by which it was designed to promote the construction of a railroad from a point in the east line of the state to a point on the Rio Grande river at or near El Paso. Under section 14 of this act, all of the vacant and unappropriated land that belonged to the state of Texas east of the 103d parallel of longitude and between the 31st and 33d degrees north latitude, and all vacant and unappropriated land belonging to the state west of said 103d degrees of longitude and between 30 degrees 30 minutes and 32 degrees north latitude, were reserved by the state until the track of the railroad should be located by the company provided for in the act. After the location of the track, reservation was limited to 30 miles on either side of the road, until the lands donated to the road under the act had been located in accordance therewith. Special Laws, 5th Leg. p. 12; Gammel's Laws of Texas, vol. 4. The road was never built, and on August 26, 1856, the Legislature passed an act opening the reserve to settlement. Section 1 of that act provides that the lands in said reserve shall be subject to location and sale as thereinafter provided from and after the 1st day of January, 1857. Section 2 reads:

"Sec. 2. That all persons who are now settled upon any portion of the said reserve belonging to the state, shall pay fifty cents per acre for his or her claim not to exceed one hundred and sixty acres, and the said parties are hereby required to have their lands surveyed by the district or county surveyor, and the field notes returned to the General Land Office by the 1st day of January, A. D. 1858, provided that all persons now resident on said reserve shall, on or before the 1st day of January, A. D. 1858, pay over to the Commissioner of the General Land Office the said amount of fifty cents per acre, for the amount of their claims. And the commissioner is hereby required to patent the surveys authorized by this section as other surveys."

Section 3 authorized the location of any genuine land certificate, etc., within the reserve after March 1, 1857; and section 4 authorized the Land Commissioner to sell scrip at 50 cents per acre after March 1, 1857, to be located upon any vacant and unappropriated land in the reserve. General Laws 6th Leg. p. 56; Gammel's Laws, vol. 4, p. 474. On November 28, 1857, an act was passed, by which settlers on the reserve were given until October 1, 1859, "to pay for their claims," and until April 1, 1858, to file their

field notes in the land office. This act provides:

"Should any person fail to pay for his or her land by that time, the land so claimed by him, shall be subject to relocation as other public domain belonging to the state." General Laws 7th Legislature, p. 7; Gammel's Laws, vol. 4, p. 878.

By section 2 of an act passed February 10, 1858, which was for the relief of various pre-emption settlers and actual settlers in said reserve, it was provided "that all those actual settlers or their assigns" who were required under the act of August 26, 1856, to pay 50 cents an acre for their lands should have until January 1, 1859, to file their field notes in the land office. General Laws, 7th Legislature, p. 152; Gammel's Laws, vol. 4, p. 1024.

The respective contentions of plaintiffs and defendants with regard to the inception of title are substantially these: Defendants contend, and a majority of the Court of Civil Appeals held, that the Rawlses were mere trespassers upon the public domain and acquired no interest in the land by virtue of the act of August 26, 1856, except the bare right or option to purchase from the state at 50 cents per acre, and that until the purchase money was paid to the state they had no interest in the land which they could convey. Plaintiffs contend, on the other hand, that under the act of 1856 the Rawlses were granted by the state, as actual settlers, the lands settled upon by them, not to exceed 160 acres to each, and that, when they had so far complied with the act as to have the land surveyed, their claim was definitely fixed to the land embraced within the boundaries of their surveys; that this claim was a valuable right; that it was assignable and was property within the community property statute; and that the subsequent payment of the amount due the state and the issuance of patent related back to the initial right granted to the Rawlses under the act of 1856 as definitely fixed by their surveys.

The question as to what is inception of the title within the meaning of our community property statutes has been the subject to frequent adjudication. The following illustrations of the application of the rule have been made:

Under the colonization act of March 24, 1825 (Laws of Coahuila & Texas, p. 15), Mexican citizens were granted the right to purchase eleven leagues of land under condition that they cultivate it within six years and pay therefor at stipulated rates for grazing, tillable, and irrigated lands. It was held in Manchaca v. Field, 62 Tex. 136, that where Sanchez, a married man, applied for and obtained on March 18, 1831, a concession for an 11-league grant, the land afterwards granted was the community property of himself and wife, although the wife died prior to the

classification or cultivation of the land and prior to the payment of the purchase price to the government. It was argued in that case that the mere concession was nothing more than a license to purchase so many leagues of land and ought not to be treated as property in being at the death of the wife, so as to entitle her heirs to claim an interest in the land afterwards granted. The court, however, held:

"There is much force in the [above] argument, and it finds an apparent sanction in Webb v. Webb, 15 Tex. 274, Walters v. Jewett, 28 Tex. 192, and perhaps other decisions of this court; but the later decisions and the weight of authority seem to favor the proposition of appellants that the concession, having a money value, and being the subject of sale, was property, in which Mrs. Sanchez had a community interest which descended to her heirs at her death, and which attached to the grant subsequently extended in the name of her husband. Porter v. Chronister, 58 Tex. 54; Wilkinson v. Wilkinson, 20 Tex. 244; Yates v. Houston, 3 Tex. 452."

In Welder v. Lambert, 91 Tex. 510, 44 S. W. 281, Power (a single man) and Hewitson obtained a contract with the state of Coahuila and Texas, under which they agreed to colonize certain families for which they were to receive certain premium lands. After a partial performance of the contract, Power married, after which the contract was completed and the grants made. After carefully reviewing the decisions, it was held that the lands were the separate property of Power; the community having only an equity therein, represented by the amount expended and value of what was done after the marriage toward completing the contract. This case reviews and cites with approval the decision in Barbet v. Langlois, 5 La. Ann. 212. In the latter case, the husband at the time of his marriage was possessor of a tract of land fronting on Bayou Placquemine. Under an act of Congress, owners of land in Louisiana fronting on any water course were given a preference right to purchase the vacant lands lying adjacent to and in the rear of their plantations. It was held that such vacant lands, though purchased after the death of the husband, were his separate property. In both of these cases, the extension of the grant was held to relate back to the right under which the title arose or had its inception, which in the former case was held to be the colonization contract, and in the latter, the preference right to purchase.

In Creamer v. Briscoe, 101 Tex. 493, 109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869, Creamer and his first wife settled upon land in 1871 in order to acquire it as a homestead donation, under the laws then in force, and did everything necessary to that end, except to complete the three years' occupancy. After they had occupied the land for more than a year, Mrs. Creamer

died, and her husband thereafter and during the three years married his second wife and with her completed the occupancy and obtained a patent. It was held that the property belonged to the community of the first marriage and that the second wife acquired no interest therein.

The same conclusion, under an analogous state of facts, is reached in Mills v. Brown, 69 Tex. 246, 6 S. W. 612, where it was held that the right to a homestead donation has its incipiency in the actual settlement of the land, and that patent afterwards issued upon completion of the occupancy will relate back to the date of settlement.

There have been four very able opinions filed in this case in the Court of Civil Appeals, two by the majority and two dissenting opinions. In these, a very full review of the authorities, both in this state and in other states, upon the question at issue, is given. In view of these opinions, we deem it sufficient only to state the considerations which induce us to conclude, as we do, that the title to the land patented to George Stiles had its inception in the conveyances under which he acquired the two surveys, and that, being at that time a single man, the land was his separate property, though the payments were made to the state and patents issued after his marriage.

The act of August 26, 1856, was a pre-emption law, and those claiming under it are classed as persons entitled to pre-emptions under the several statutes extending relief to persons holding under the several pre-emption laws. Miller v. Moss, 65 Tex. 181. This act gave all actual settlers upon the reserve at the time of its passage the right to have "their lands" surveyed and patented provided their claims were surveyed, the field notes returned to the Land Office, and 50 cents per acre paid within the time prescribed by the act. We can see no substantial difference between the rights acquired by actual settlers on the reservation under this act and the right given to Mexican citizens under the act of 1824, or the right which was a mere preference right to purchase under which the land in the Langlois Case, above, was acquired. In both of the cases last mentioned, the lands had to be surveyed and the purchase price paid; yet it was held that the rights acquired in the first case, by virtue of being a Mexican citizen and making application for a grant, and, in the second, by virtue of a statute which gave a preference right to purchase, amounted, under the community system, to inception of title and impressed the lands afterwards granted with the character of the holding at the time the right was acquired. Nor can we distinguish any material difference between the right granted to settlers under the act of 1856 and the rights acquired by settling on land under homestead donation statutes. In all of these

cases, something had either to be done or paid before title could issue. The act of settlement in homestead donation cases is held to be the inception of the title.

[3] That actual settlers under the act of 1856 did acquire a valuable right to their claims, and that such right or interest was of such character as to be the subject of contract and assignable, we think is plain under our decisions. In Johnson v. Newman, 43 Tex. 639, it was held that the right to acquire lands guaranteed to citizens of Texas by the Constitution of the Republic was an assignable right, and that a conveyance of such right would entitle the grantee to lands afterwards patented thereunder. It is true that there is nothing in the original act which in express terms says that settlers shall have the right to sell their claims, but we think that such right necessarily follows from the nature of the rights acquired under the act. The right "to their lands" was made absolute by the statute, subject only to forfeiture by a failure to comply, within the time designated, with the provisions of the statute. Nothing was required of the settlers which could not be done as well by others as by themselves. Having the land surveyed, the field notes returned to the land office, and payment of 50 cents per acre to the state, were acts which could be performed as readily by their assigns as by themselves. If any doubt whatever might have existed relative to the assignability of these claims, it is certainly removed by the relief act of February 10, 1858, recognizing the assigns of settlers, which was passed prior to the marriage of George and Zilpah Stiles.

It is probably true that, up to the time of actual survey of these lands, the right of the settlers was a floating one, the boundaries of their claims not being fixed; but, when the surveys were made, their claims were changed from floating ones to definite claims to the particular lands described in the field notes. The surveys, in our opinion, had the effect only to evidence an acceptance and assertion of claim under the act of 1856 and a definite fixing of the boundaries of their claims. The right itself to 160 acres of land, in our opinion, had its inception in the act of 1856.

Much stress seems to be laid by the majority of the Court of Civil Appeals upon the question as to whether or not there was a contract, express or implied, between the state and the Rawlses. We do not think it necessary, in order to establish the validity of a claim to land under the various settlement acts—at least as against every one but the state—that the elements of contract should be shown to exist. In the settlement of vacant lands of the state, many considerations of policy were involved. The state had the right to dispose of its lands in any manner deemed proper by it, and, as to third parties, its grants depended in no sense for

validity upon the question as to whether or not the claimant had 'any right or obligation, either moral or legal, enforceable against the state. A glance at the map will show that the act of 1853 reserved from actual settlement a strip of land approximately 140 miles in width, extending from the eastern boundaries of the state to the eastern boundary of New Mexico (103d parallel), and from that parallel, a strip approximately 110 miles wide, extending to the Rio Grande. Within this broad domain were included some of the best portions of the state. The purpose of the act was to induce the building of a railroad from the eastern to the western boundary of Texas, with its consequent benefits to the state at large. While the reservation was absolute so long as the terms of the act were not accepted, and the act was not repealed, it was no doubt contemplated that, if the act were not accepted within a reasonable time, it would be repealed and these lands would be thrown open to settlement as theretofore. Upon an acceptance of the act and location of the road, the reservation was automatically diminished to a strip of land 60 miles wide or 30 miles on each side of the road as located. During the time the act remained in force from 1853 until August, 1856, while it is true that actual settlers acquired no interest by settlement which they could enforce, and were therefore only naked trespassers upon the public domain, it is no doubt also true that settlers were attracted to this reserve by virtue of the quality of the lands embraced therein, confidently believing that, whenever the reserve should be opened for settlement, the state would protect them in the settlements they had made. That such would not be done was, of course, a risk which they assumed. It is not necessary, in order to support the state's recognition of these claims, that they should have any validity prior to the time of their recognition.

[4] The granting of lands to settlers within the state was a matter which addressed itself solely to the Legislature which had in charge the direction of the state's policies in that regard; and when the time arrived to open this reservation for settlement, the project of building the railroad having failed, it was clearly within the power of the state to say whether consideration should be given to those who, during the period of reservation, had settled thereon, and what such consideration should be. The Legislature determined that such settlers should be invested with a right to what it termed "their claims," not exceeding 160 acres. Thereby, the Legislature recognized that such settlers had claims of some character which merited consideration by the state. It is no answer to the existence of these claims, as thus recognized, that the Legislature also re-quired the payment of 50 cents per acre for the lands. Nor is it material, we think, that the Legislature also saw fit after March 1, 1857, to authorize the sale of scrip at 50 cents per acre, to be located upon the unapportioned parts of the reservation. It is not accurate to say that the purchasers of said scrip acquired the same right as actual settlers at the date of the opening of the reservation. Such purchasers could only locate their scrip upon portions of the reservation not therefore segregated from the public domain. These claims were protected from location so long as the claimants were not in default in complying with the conditions necessary to complete their titles. That these lands had a money value in excess of that of the great body of land which was opened to location under scrip purchased from the Land Commissioner is evident—if proof of value were required—from the expressed consideration in the deeds to George Stiles.

We do not deem it material to determine whether the rights which the Rawlses acquired by the act of 1856, and their surveys thereunder, were revocable by the state until the purchase money was paid. As was said in the Creamer Case:

"From the time of the initial steps, the settlement, they have the right to hold and use the land as owners against any one but the state, and against the state at least so long as they comply with the law and it remains unchanged."

We conclude that the lands were the separate property of George Stiles, subject to the right in the community to reimbursement for the community funds afterwards used in completing the right to obtain patents.

Having concluded that the Court of Civil Appeals was in error in holding that the land belonged to the community of George and Zilpah Stiles, it becomes our duty to consider whether other matters raised in appellants' (defendants') brief require a reversal of the trial court's judgment.

[5] Error is assigned upon refusal of the trial court to make the executors under the will of Mrs. Mullins parties to the suit. The executors were independent of the court, but had no special powers, and, there being no debts of the estate at the time of the trial, they had no interest as executors in the property. Consequently there was no error in refusing to make them parties.

Complaint is made of paragraph 3 of the court's charge and of the refusal of defendants' special charges numbered 6, 7, and 8, all of which relate to the question of limitation. These charges paraphrased are substantially as follows:

Paragraph 3 is to the effect that if the jury should find that Mrs. Stiles at the death of her husband took and retained possession of the property as her own, and never recognized any rights of plaintiffs therein, and that

the plaintiffs, or any one or more of them, knew that she was so in possession and claiming the property as her own, and that she had peaceable and adverse possession thereof for ten years, using and enjoying the same, then they should find for the defendants as against such of the plaintiffs, if any, as knew that she was in possession and claiming the property as her own, if she was.

Special charge No. 6 was to the effect that if upon the death of her husband Mrs. Stiles believed the property to be her own and held adverse and continuous possession thereof for ten years, claiming it as her own, using, cultivating, possessing, and enjoying it as her separate, sole, and individual property for ten years, adversely to the plaintiffs, then it was not necessary for her to notify plaintiffs of such possession, and in such event the jury should find for defendants.

Special charge No. 7 was to the effect that if Mrs. Stiles believed the property her own upon the death of her husband, and took and retained possession thereof as her own, and had peaceable and adverse possession thereof from the death of her husband until her death, then they should find for the defendants.

Special charge No. 8 was to the effect that if the jury should find that Mrs. Stiles believed the property her own upon the death of her husband, and took and retained possession thereof as her own, and had peaceable and adverse possession thereof from the death of her husband until her death, and that the plaintiffs knew that she was so holding and claiming it, or "that they, in the exercise of such care and diligence as an ordinarily careful and prudent person would have exercised under similar circumstances, should have known that she was so holding and claiming such property, then you will find for the defendants."

[6, 7] To each of special charges 7 and 8 is added this paragraph:

"By 'peaceable possession,' as used in this instruction, is meant a continuous possession, not interrupted by adverse suits to recover the property, and by 'adverse possession' is meant an actual and visible appropriation of the land under a claim of right inconsistent with and hostile to the claim of others."

"The possession of a cotenant or tenant in common will be presumed to be in right of the common title. He will not be permitted to claim the protection of the statute of limitations unless it clearly appears that he has repudiated the title of his cotenant and is holding adversely to it. Possession and payment of taxes on the property do not constitute the assertion of an adverse right. There must be something more. Alexander v. Kennedy, 19 Tex. 496 [70 Am. Dec. 358]. The acts relied upon by the tenant in common in showing an ouster of his cotenants and the assertion of an adverse claim should be more certain and unequivocal in character than would be necessary in ordinary cases where there is no privity of estate between the parties claiming the property; and in order to affect the cotenants with this adverse holding notice of such fact must be brought home to them, either by information to this effect given by the tenant in common asserting the adverse right; or by such acts of unequivocal notoriety in the assertion of such adverse and hostile claim that they will be presumed to have notice of such adverse right." Phillipson v. Flynn, 83 Tex. 582, 19 S. W. 138.

"In order to put the statute of limitation in operation, the cotenant not in possession must have actual knowledge of the fact that the cotenant in possession is disputing his right to the property, or such cotenant's possession and assertion of hostile claim must be so notorious as to authorize the presumption that the other joint owner has knowledge thereof." House et al. v. Williams et al., 16 Tex. Civ. App. 122, 40 S. W. 414.

The above principles are well established by a long line of authorities in this state. Alexander v. Kennedy, 19 Tex. 488, 70 Am. Dec. 358; Peeler v. Guilkey, 27 Tex. 358; Bailey v. Trammell, 27 Tex. 328; Moody v. Butler, 63 Tex. 213; McDougle v. Bradford, 80 Tex. 565, 16 S. W. 619; Keith v. Keith, 39 Tex. Civ. App. 363, 87 S. W. 385; Newcomb v. Cox, 27 Tex. Civ. App. 583, 66 S. W. 338; Garcia v. Illg, 14 Tex. Civ. App. 482, 37 S. W. 471.

The third paragraph of the court's charge presents no affirmative error; consequently, it was the duty of the defendants, if not satisfied with the charge, to present a charge which supplied the omission. None of the special charges referred to correctly states the law of limitations as applied to the relation of cotenancy. To render them proper as applied to the particular case, they should have informed the jury that Mrs. Stiles, upon the death of her husband, took possession of the property as cotenant of the plaintiffs; and that her possession would be presumed to be in right of the common title unless the jury should believe from the evidence that she repudiated the rights of the plaintiffs, and that such repudiation was known to plaintiffs, or that her possession and assertion of hostile claim was of such notorious character as that notice thereof would be presumed.

[8] Objection was made to the admission in evidence of the field notes of the two surveys taken from the records of the county surveyor of Ellis county. We believe these field notes were admissible for the purpose of showing the fact and date of the surveys and the certificate or right under which the surveys were made. Stout v. Taul, 71 Tex. 438, 9 S. W. 329. That the act of August 26, 1856, did not require the field notes to be recorded in the county, but merely returned to the land office, we think does not affect the admissibility of the county records. The act of 1856 was not intended in any way to affect the general statutes upon the subject

of keeping the records of surveys made by the county and district surveyors.

Defendants also presented a special charge instructing the jury not to consider the recitals in these field notes as evidence of the facts therein recited. This charge was properly refused for the reasons already stated, and for the further reason that, by instructing the jury peremptorily that the land was the separate property of George Stiles, consideration of all evidence relating to the title up to the time of the death of George Stiles was withdrawn from the jury.

[9] Objection was also made to the admission of the testimony of certain of the plaintiffs to statements and conversations with Zilpah Mullins during her lifetime, based upon article 3690, Revised Statutes 1911. As we have heretofore held, the executors of Zilpah Mullins were not necessary parties to this suit. The inhibition against parties testifying to conversations and transactions with the deceased is limited to actions by or against executors, administrators, guardians, heirs, or legal representatives. It has been held that the statute applies only to the particular classes of persons named therein and that legatees and devisees do not come within the meaning of the terms used. Newton v. Newton, 77 Tex. 508, 14 S. W. 157.

[10] Defendants requested a special charge based upon article 5707, Revised Statutes 1911, under which they were authorized to find, by presumption, that plaintiff Sam H. Stiles was dead. The evidence showed that Sam H. Stiles was a single man and had moved from Texas many years ago, and that some of the plaintiffs testifying had not heard of him for a period of about fifteen years. These facts, we think, are insufficient to raise the issue of presumption of death under the above statute. In Latham v. Tombs, 32 Tex. Civ. App. 270, 73 S. W. 1060, it was held that the statute must be construed to mean that the person referred to must absent himself from his home, and proof of change of his residence from one state to another, and that he had not been heard of in the former state for a period of seven years, does not make a case within the statute.

[11, 12] The remaining assignments of error are but reiterations of those already considered, except that under the sixteenth assignment of error defendants contend that there was no basis in the evidence for a personal judgment against the defendants, or either of them individually for rent. We believe the judgment against defendant Hawkins was proper. His possession, whether he entered as executor or as devisee, was that of a cotenant with the plaintiffs. As executor under the will, his possession only extended to the interest of Mrs. Mullins in the lands, and he was personally accountable to the plaintiffs for their half of the rent. George Stell, however, never having been in possession of the property, either personally or in a representative capacity, and never having collected or received any of the rents, we think was not personally liable to the plaintiffs on that account; and to that extent the judgment of the trial court is erroneous.

We conclude that the judgment of the Court of Civil Appeals should be reversed, and that the judgment of the trial court in so far as it is against George Stell personally for one-half of the rent should be reversed and reformed so as to deny such personal judgment for rent, and, as so reformed, the judgment of the trial court should be affirmed.

PHILLIPS, C. J. The judgment recommended by the Commission of Appeals in the above case is adopted and will be entered as the judgment of the Supreme Court.