## APPEAL OF JOHN E. SADDLER.

Docket No. 3796. Submitted July 8, 1925. Decided November 11, 1925.

> A bank closed its doors and went into liquidation on April 25, 1921. Upon the evidence contained in the record of this appeal, it is *held* that 50 per cent of the face value of deposit accounts in this bank should be allowed as a bad debt deduction, under section 214(a)(7) of the Revenue Act of 1921, to a taxpayer in computing his individual income-tax liability for the calendar year 1921.

*J. A. Neely, Esq.*, for the taxpayer.
*Robert A. Littleton, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency for the year 1921 in the amount of $205.83. The question involved is whether or not certain amounts claimed as bad debt deductions under section 214(a)(7) of the Revenue Act of 1921 should be allowed.

### FINDINGS OF FACT.

The taxpayer is an individual residing at Anderson, S. C. During the year 1921 he was engaged in the automobile business.

On July 21, 1921, the taxpayer accepted in payment for an automobile an assignment of an account of $1,000 with the Farmers Loan & Trust Co. standing in the name of E. E. Elmore. On July 29, 1921, he accepted in payment for an automobile an assignment of an account with the same bank standing in the name of Frank Wrenn, in the amount of $1,837.67. These accounts were accepted by the taxpayer and entered upon his books at face value.

The Farmers Loan & Trust Co. had previously, on April 25, 1921, closed its doors and ceased to do business. On May 25, 1921, J. J. Major took charge of the affairs of the bank as acting president and liquidating agent. Prior to the close of the year the taxpayer talked with Major and R. M. Cathcart, cashier of the bank, and as a result of the information so obtained concluded that he would never recover more than one-half of the amount of his claims. One-half of the deposit accounts, $1,418.83, was charged off on the books of the taxpayer as of December 30, 1921. In his return for the year 1921 the taxpayer deducted that amount from gross income under the heading of bad debts.

### DECISION.

The deficiency determined by the Commissioner is disallowed.

## OPINION.

TRUSSELL: The accepted interpretation of the so-called bad debt deduction provisions of all taxing acts from 1909 to 1918, inclusive, has been that no allowance or loss from bad debts could be permitted unless the whole sum of the debt had been ascertained to be entirely worthless and charged off by the taxpayer in one calendar or fiscal year. The result of this interpretation has been that in many, and in perhaps most, cases the bad debt deduction has been claimed and allowed long after the events out of which the debt arose, and that the loss was deducted in years long after the original debt had been reflected in gross income. Congress saw fit in framing the Revenue Act of 1921 to change this situation, and in that Act made the bad debt deduction provision read as follows:

Sec. 214. (a)  *  *  *  (7) Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts) ; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part.

Under this provision it becomes possible that bad debt deductions may be reflected in a taxpayer's net income during the same year, or near thereto, in which the debt was first reflected in gross income. The same Act of 1921 provided also, in section 214(a)(6), that certain deductions for losses might in the exercise of the Commissioner's discretion be allocated to years other than those in which the loss was actually sustained in order to reflect more truly the taxpayer's net income. In the instant appeal the taxpayer during the early summer of 1921 accepted assignments of two deposit accounts in a closed and liquidating bank. He took these assignments as payments upon the purchase price of two automobiles and the deposit accounts were received by him and entered upon his books at their face value and so reflected in his gross income for the calendar year 1921.

Concerning the value of these accounts as assets, the taxpayer testified:

I investigated the value of deposits in the Farmers Loan & Trust Co. prior to the end of 1921. I talked to Mr. J. J. Major, its president, and Mr. R. M. Cathcart, its cashier, who were winding up the affairs of the said bank. I could not get very much information out of them as to the market price of the deposits, but figured I would be lucky if I could get half of the deposit. I concluded I had lost half of the deposit. I charged half of the deposit off, on my books, in 1921.

J. J. Major, one of the liquidating agents of the bank, testified:

I could not ascertain in 1921 what the loans and discounts of the bank were worth. I had very little idea what I could collect. I thought I would do well if I could collect 25 per cent. of the loans and discounts. I talked to

several bankers and they said I could not get more than 25 per cent. of the loans and discounts.

Q. Did you, in 1921, think you could get more than one-third of the loans and discounts?

A. I thought fifty per cent. after adding the assessment on stockholders would be the outside of what could be collected. I mean fifty per cent. could be paid depositors in the end, it will not miss that figure far. Possibly a little more or less. Thirty-five and two one hundredths per cent. has been paid depositors so far.

In 1921 I did not expect to realize more than fifty per cent. of the $75,000 stock liability of stockholders, we did get about $39,000.

The first dividend was paid in December, 1922. I paid it as soon as I could collect from the assets of the bank.

## T. Frank Watkins testified:

I am a practicing attorney. I was attorney for Farmers Loan & Trust Company during its liquidation. As such attorney I canvassed the loans and notes of Farmers Loan & Trust Company. I concluded in 1921, that there was a tremendous loss in the notes after estimating them carefully as I could and I came to the conclusion that the bank would hardly pay depositors more than 35¢ on the dollar from assets other than stockholders' liability. And I considered $50,000 the amount that we would receive from stockholders' liability.

Q. Was it reasonably ascertained that a depositor had lost one-half of his deposit?

A. Yes. In my opinion there was very little ground for expecting depositors to realize quite 50%.

It appears from the record that this taxpayer, near the close of 1921, made inquiries from the president and the cashier of the liquidating bank, who must be presumed to have been the best informed sources of information respecting the conditions of the bank's accounts and the possibilities of creditors recovering the amount due them by the liquidating bank. Upon the information so obtained he arrived at the definite conclusion that not less than one-half of his claims against the bank was a total loss. The ascertainment of the worthlessness of a debt, either in whole or in part, is the exercise of sound business judgment based upon as complete information as is practicably obtainable. This taxpayer diligently sought for the necessary information from the best sources possible. He arrived at the conviction that he would never be able to recover more than one-half of the accounts here in controversy, and, acting upon that conviction, caused one-half of the debts to be charged off as a loss in closing his books for the year 1921. From the testimony taken on the 29th of June, 1925, three and one-half years after the write-off of these losses, it appears that the creditors of this closed bank had received liquidating dividends aggregating 35.02 per cent of the face value of their claims. It thus appears that developments subsequent to the writing off of the

losses by this taxpayer fully justified his conclusion in December, 1921, that fully 50 per cent of his claims were a loss and that his action in writing down these accounts was in accord with the purposes of Congress in authorizing the partial write-off of debts. We are, therefore, of the opinion that the Commissioner should have allowed the deduction as claimed by the taxpayer and that the deficiency now asserted must be disallowed.