ALLIE M. TURBEVILLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 43733, 47900, 55553, 64334, 64560.   Promulgated October 12, 1934.

*John B. King, Esq.*, for the petitioner.
*S. S. Faulkner, Esq.*, for the respondent.

OPINION.

GOODRICH: In these proceedings, which upon motion were consolidated, petitioner seeks redeterminations of the following deficiencies in income tax:

| | |
|---|---|
| 1925 | $2, 376. 93 |
| 1926 | 57, 653. 05 |
| 1927 | 43, 973. 57 |
| 1928 | 17, 588. 18 |
| 1929 | 6, 095. 91 |

The principal controversy involves amounts received in each year as bonuses and royalties under oil and gas leases granted by petitioner. Respondent determined that these amounts, in their entirety, were the income of and taxable to petitioner. Petitioner contends the bonuses and royalties were community income and should therefore be divided and taxed equally between herself and her husband. She contends further that even though these amounts were not community income, still one half of these payments belonged to her husband either by reason of her assignment thereof to him, or as compensation for his services rendered in managing her separate properties and negotiating the leases.

She alleges also that respondent erred (a) in treating the amounts received as bonuses as income for the year in which received and failing to spread the same over the life of the leases; (b) in failing to tax the bonuses received as capital net gains, subject to the 12½ percent limitation; (c) in failing to allow as a deduction from income an allowance for depletion of bonuses amounting to 27½ percent thereof; (d) in failing to allow as deductions from income the full amount of certain items of business expense incurred in connection with the receipt of the bonuses and royalties; (e) in failing to allow as deductions from income the full amount of state, county, and school district ad valorem taxes levied and paid on account of her retained royalty interest in the leased lands; and (f) in failing to

allow as a deduction from her income in 1929, $12,500, being one half of an amount claimed lost on a bank deposit.

The facts were submitted upon stipulation which we adopt as our findings. A briefer statement will serve for the purposes of this report.

At the times here material petitioner was a resident of Archer City, Texas. She married J. H. Turbeville on April 22, 1919. She had been married previously to S. M. Cowan, who died, a resident of Texas, in 1917, leaving him surviving petitioner and their four minor children. At the time of Cowan's death he and petitioner owned a substantial amount of community property, including a ranch of about 8,000 acres near Archer City, constituting one body or tract of land, known as the Copper Mine Ranch. Petitioner qualified as community administratrix of Cowan's estate, and thereafter on October 28, 1922, acquired from her children their one-half interest in the ranch. Shortly before her marriage to Turbeville, petitioner, individually and as administratrix, granted to him an oil and gas lease covering the Copper Mine Ranch, reserving a one-eighth interest of the sale proceeds of oil and gas. The lease was for a five-year term and so long thereafter as oil or gas might be produced, but required that, unless production was obtained within a year from date of grant, annual delay rentals should be paid for the privilege of extending the drilling time. A few months after his marriage to petitioner this lease was assigned by Turbeville to others.

Before and at the time of her marriage to Turbeville, petitioner had no business experience, nor had her children. At her request, Turbeville took over complete management of the properties belonging to petitioner and her children, and handled them along with and as his own. Because of petitioner's lack of business experience and Turbeville's assumption of the management of her properties, they reached a verbal agreement and understanding that one half of all income from the property of either should belong to the other.

In the fall of 1921 petitioner and her husband, and two of her sons, formed a partnership to engage in the cattle and ranching business and purchased a large ranch upon which they assumed a substantial indebtedness. Due to unfavorable conditions arising in the cattle business, the financing of the ranch purchase became a difficult problem, the burden of which fell on Turbeville, who, up until 1925, was forced to use every available means of credit to meet this obligation. As a means of saving their properties, and in consideration of Turbeville's labor and efforts, he and petitioner further verbally agreed that all their income from whatever source should

be considered community income and be used by him to pay community obligations and to carry on the business of the partnership. Pursuant to that agreement all income from Turbeville's separate property, from petitioner's separate property, and from their community properties went into a common fund and was used by Turbeville, without reference to its source, as the community income of himself and petitioner.

During this time Turbeville was endeavoring to secure exploitation and development of the Copper Mine Ranch under the oil and gas lease previously granted to him, and by him assigned. His repeated efforts to get the assignees to comply with the terms of the lease having failed, he and petitioner brought suit in the local court seeking cancellation of the lease and its assignments. The suit was removed to United States District Court for the Northern District of Texas, which, on December 3, 1923, decreed the cancellation of the lease as to 490 acres, revesting the title thereto in petitioner and her husband, and allowing the defendants limited additional time within which to commence drilling upon the remaining acreage. Development was not begun within the time fixed, and the lease as to the remaining acreage was forfeited in April 1924. Thereupon, Turbeville, continuing his efforts to have the property exploited, succeeded in making a number of leases during the years 1925, 1926, 1927, and 1929 covering various portions of the Copper Mine Ranch. These leases were executed by petitioner and her husband, and reserved one eighth of the oil as royalty. As a result of development under one or more of these leases, oil was discovered on the Copper Mine Ranch on July 12, 1926. Bonuses upon the granting of the leases and royalties upon production thereunder were received in the following amounts:

| Year | Bonuses | Royalties |
|------|---------|-----------|
| 1925 | $63,145.77 | $0.00 |
| 1926 | 162,891.05 | 118,437.82 |
| 1927 | 40,550.00 | 235,652.03 |
| 1928 | 0.00 | 113,613.43 |
| 1929 | 3,692.00 | 68,162.05 |

These amounts were received by Turbeville and placed to his credit in banks of which he was a customer, and under the preexisting agreement between him and petitioner, they belonged one half to petitioner, and one half to him, " the said agreement being that in consideration of the services of the said Turbeville to manage, look after and control their properties and to secure oil development on the properties of petitioner or her husband, that all royal-

ties, revenues and bonuses received therefrom should equally belong to petitioner and to the said Turbeville."

When these leases were granted and the bonuses paid, there was no production of oil upon the acreage covered by the several leases, but from and after July 12, 1926, there was oil produced continuously from the Copper Mine Ranch.

The business expenses directly attributable to the receipt of the bonuses and royalties and the amounts of state and local taxes paid on the retained royalty interest in the Copper Mine Ranch are as follows:

| Year | Business expenses | Taxes |
|------|------------------:|------:|
| 1926 | $7,652.99 | $0.00 |
| 1927 | 8,044.32 | 7,692.92 |
| 1928 | 5,833.36 | 9,197.23 |
| 1929 | 5,762.63 | 4,659.26 |

With respect to the last issue, the facts are stipulated as follows:

That petitioner and her husband in 1929 had on special deposit with the Power Bank Company of Archer City, Texas, the sum of $60,000.00 which deposit was secured by the pledge to petitioner and her husband of Class B American Refining Properties Certificates of the par value of $98,000.00. That the Power Banking Company became hopelessly insolvent in 1929 and by December 31, 1929, it was ascertained that petitioner and her husband must look alone to the Class B Certificates of the American Refining Properties for the recovery of their deposit or any part thereof. That said Class B American Refining Properties Certificates on December 31, 1929 had a fair market value and were worth only the sum of $35,000.00. That petitioner and her husband kept no books of account except a memorandum cash journal. That no charge-off was made on such books of the petitioner and her husband with reference to this transaction nor any deduction claimed therefor in the petitioner's income tax return for the year 1929.

Respondent has determined that, since the leases under which the bonuses and royalties here in controversy arose were all upon her separate lands, the payments were therefore her separate income. Petitioner contends that these amounts, even though the leases under which they arose covered her separate property, belonged to the community because:

(a) Community funds and labor were employed to produce them and, consequently, they are not the separate property of petitioner;

(b) Under her agreement with her husband, one half of them belonged to him; and

(c) They are rents and revenues, and not proceeds from sales of land.

In support of the first ground urged, petitioner reminds us that in Texas a wife's separate property includes not only that owned or claimed by her before marriage and that afterward acquired by gift,

devise, or descent, but also, with respect to her real property, "the increase of all lands thus acquired,"[1] if *fructus naturales*, or such increase as is spontaneous growth or output of the soil.[2] She argues that the bonuses and royalties, however, do not fall within the statutory definition of separate income because profits from the sale of leases are *fructus industriales*, and belong to the community estate.[3] In other words, she contends that the making of the leases was a business enterprise into which were put community funds and community labor and that the segregation of the minerals under the lands was a result thereof, with the result that the profits from the leases belonged to the community.[4]

The facts as stipulated are that these leases were negotiated through the efforts of petitioner's husband, who undertook the task at her request, and that the expense incurred in connection therewith ran from between $5,000 to $8,000 each year. Whether the funds by which the expenses were paid were separate or community, the record does not disclose. We think it clear, however, that the granting of the leases was not such a segregation of the "increase of the land" as to make the profits derived therefrom *fructus industriales*. The segregating was done by the lessees who sunk the wells, extracted, transported, and sold the oil and gas. Under the laws of Texas, a lease is regarded as a present sale of the oil and gas in place, and, consequently, any community funds or labor expended in negotiating leases were directed toward effecting such sales. Thus petitioner sold a part of her separate estate, namely, the oil and gas underlying her separate real estate, and the proceeds of those sales remained her separate property.[5]

---

[1] Art. 16, sec. 15, Constitution of Texas; art. 4614, Revised Civil Statutes of Texas, 1925.

[2] Speer, 23 Texas Jurisprudence, par. 52.

[3] *Ibid.* But when in the act of segregating there is to any substantial extent an employment of community funds or labor, such things become impressed with the community character and by common consent are classed with the community estate. The increase then becomes *fructus industriales.* The conclusion of community in such cases is hastened by the universal rule requiring one who asserts the separate character of a fund claimed to trace the same, a matter of impossibility in such cases as are instanced.

[4] *Idem,* par. 102. Whatever is acquired by husband or wife, by trade, speculation or venture, whether with the community funds or the separate funds is community property. * * * It is difficult to cast a rule, but it would appear to be that where the profits are the result of a purpose and plan to buy and sell as a business, such profits are community. But where they are the mere gains arising from the ordinary changes and mutations in the form of the property or fund, there will be no change in the status.

[5] Since the wife's separate property may be alienated in the manner prescribed by law, the inquiry immediately arises, whether or not the proceeds of the same, when sold, assume the same status as such property. But one answer can be given. Where the statute nowhere declares that her rights are forfeited by an alienation (if, indeed, such restriction could be lawful) the right to own would carry with it the incidental right of disposition. The proceeds arising from such disposition cannot, by any process of reasoning, be said to be converted from the separate into the community fund. They will stand in lieu of the thing given for them, and occupy precisely the same status as property as they did. If her separate estate consists of land or money, she may sell the

Nor do we think that the granting of the leases was such an enterprise as would constitute for either petitioner or her husband a "trade, speculation or venture" (see footnote 4, *supra*) as petitioner contends both here and in an alternative argument. There is nothing to indicate that they proposed to buy and sell leases as a business. No doubt, as petitioner argues, the negotiation of the leases called for good business judgment and consistent effort. But there is nothing remarkable in that. Turbeville had something to sell and was doing his best with it. We disagree with petitioner's view that the fact that leases on her separate property were negotiated by her husband impressed the bonuses and royalties received thereunder with the community character. *Stephens* v. *Stephens*, 292 S. W. 290; *Evans* v. *Purinton*, 34 S. W. 350 (as to royalties).

Respecting the second reason advanced, which she repeats in slightly different form in an alternative argument, petitioner points to the agreement between herself and her husband that in consideration of his efforts in managing her properties, including the securing of oil development, one half of all income from the separate property of each should belong to the other, and contends that such an arrangement changed the character of the bonuses and royalties received under leases negotiated by her husband in the course of his management and control of her separate properties.

We are not impressed by this argument. Petitioner does not show us, nor do we find that, under the law of Texas, such an agreement between husband and wife respecting the division of income upon its receipt serves to change its character or that of the property from which it arises. The agreement was, in effect, "If you, my husband, will take charge of my properties and manage them, I will give you half of the income from them." As we see it, the agreement was no more than an assignment of future income; it transferred no interest in petitioner's properties and therefore under the well established rule that the assignment of income, or the mere right to receive it, without transfer of the property right from which the income arises, does not relieve the assignor of the burden of the tax on the income, the full amount of bonuses and royalties received belonged to petitioner. *Lucas* v. *Earl*, 281 U.S. 111; *Saenger* v. *Commissioner*, 69 Fed. (2d) 631; 69 Fed. (2d) 633, affirming 28 B. T. A. 377; *W. L. Shore*, 26 B. T. A. 389 (where the leases themselves contained an assignment of income); *John Leo Stack*, 22 B. T. A. 707.

---

one and invest the other; and in either case the new acquisition will belong to her. (Speer, Law of Marital Rights in Texas, 3d ed., p. 514.)

Cash considerations paid for the granting of leases upon separate property are the separate income of the owner of the property. *James R. Parkey*, 16 B. T. A. 441; *John O'Neil*, 16 B. T. A. 614; *W. P. Ferguson*, 20 B. T. A. 130; affirmed as to this issue, 45 Fed. (2d) 573; *Oscar Chesson*, 22 B. T. A. 818; petition to review denied, 57 Fed. (2d) 141; *E. Michna*, 24 B. T. A. 715; *J. T. Sneed, Jr.*, 30 B. T. A. 1121.

Petitioner's third argument we discard likewise. She contends that, under the decision in *Burnet* v. *Harmel*, 287 U. S. 103, the bonuses and royalties received were rents and revenues, and not proceeds from sales of land, and so considered are community property.[6]

In *Burnet* v. *Harmel*, *supra*, the Supreme Court considered whether, under Texas law, bonuses and royalties received under oil and gas leases were income or " gain from the sale or exchange of capital assets " within the meaning of section 208 (a) (1) of the Revenue Act of 1924. The Court held that even though under the law of State of Texas oil and gas leases effect a present sale of oil and gas in place, the payments under the leases were not proceeds of " sale " as that term is used in the provision of the taxing act relating to capital gains, but should be taxed as ordinary income. The Court did not have before it the question of whether royalties and bonuses arising under leases belonged to the community or to the spouse whose separate estate embraced the leases. That question, in this case, is to be determined by the law of Texas. *Poe* v. *Seaborn*, 282 U. S. 101; *Hopkins* v. *Bacon*, 282 U. S. 122. Since that law declares an oil and gas lease to effect a sale of oil and gas in place, the proceeds of such a sale, whether they be bonuses or royalties, are not rents and revenues, but are the consideration received for the minerals. *Stephens* v. *Stephens*, *supra*. They take the place of the property sold and remain the separate property of the wife where, as here, the leases are made upon her separate property. *E. Michna*, 24 B.T.A. 715.

As an alternative ground, should we hold adversely to petitioner's claim that one-half the bonuses and royalties received belonged to her husband (as we have done), petitioner contends that a seven-eighths interest in the minerals underlying the lands covered by the leases here involved was community property because at the date of her marriage to Turbeville she neither owned nor claimed that interest. She argues that the lease she delivered to Turbeville a few days before their marriage, and which he thereafter assigned, granted to the lessee a determinable fee to seven-eighths of the minerals in place, operated as a severance, and left petitioner with only a possibility of reverter, and that when the leasehold estate was subsequently recovered it became community property because it re-

---

[6] See art. 4614, Revised Civil Statutes of Texas, providing that rents and revenues from separate property of wife should likewise be her separate property. This legislation was rejected on constitutional grounds; *Arnold* v. *Leonard*, 273 S. W. 799 ; and in Texas the rents and revenues of the separate property of either spouse are community income. *Brittain* v. *O'Banion*, 56 S. W. (2d) 249 ; *Hawkins* v. *Britton State Bank*, 52 S. W. (2d) 243 ; *Wheeler* v. *Lee*, 53 S. W. (2d) 648 ; *Frame* v. *Frame*, 36 S. W. (2d) 152 ; *Willcut* v. *Willcut*, 278 S. W. 236.

verted not by virtue of the original instrument, but by decree of court.

We disagree with petitioner. As we see it, the right to cancel the original lease and assignments thereof upon failure of compliance with its terms, and so to recover the lands and all interests therein, had its origin and inception when the original lease was made, which was before petitioner married Turbeville. At that time this interest was petitioner's separate property and upon its recovery it reassumes that same status.[7] Neither Turbeville nor the marital community acquired any interest in the property by reason of his joinder in the suit to cancel the lease and quiet title. He was a necessary, but only a nominal, party to the suit relating to his wife's separate property, and in aiding the prosecution of it served as her agent.[8] Since petitioner's right of recovery of the leased lands had its inception prior to her marriage to Turbeville, the title to the seven-eighths mineral estate, when reacquired through court decree, related back to that time and was again her separate property. Cf. *E. Michna, supra; John M. King*, 26 B. T. A. 1158; affd., 69 Fed. (2d) 639.

Petitioner alleges as error respondent's failure to treat the bonuses received as gain from sale of capital assets within the meaning of section 208 of the Revenue Act of 1926, and subject to the tax limitation of 12½ per centum. This issue is not urged upon brief, and has been decided adversely to petitioner's contention in *Burnet* v. *Harmel, supra.* So also has been her contention that the amounts received as bonuses should not be treated in their entirety as income in the year in which received but should be spread over the respective periods of the leases. *Nelson Land & Oil Co.*, 3 B. T. A. 315; *R. H. Hazlett*, 10 B. T. A. 332; *O'Day Investment Co.*, 13 B. T. A. 1230; *A. P. Schiro, Inc.*, 20 B. T. A., 1026; *W. M. Scott*, 27 B. T. A. 951.

Petitioner's next contention is that one half of the total bonuses and royalties received should be deducted from her income as

---

[7] In *Jackson* v. *Jackson*, 258 S..W. 231, the Texas Court of Civil Appeals, among other things, said:

"The character of the title to property with reference to being separate or community depends upon the existence or non-existence of the marriage at the time of the incipiency of the right by virtue of which title is finally vested, and when title is so vested it relates back to that time. *Creamer* v. *Briscoe*, 101 Tex. 490, 109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869; *Welder* v. *Lambert*, 91 Tex. 510, 44 S. W. 281."

To the same effect see *Price* v. *McAnelly*, 287 S. W. 77; *Evans* v. *Ingram*, 288 S. W. 494; *Stiles* v. *Hawkins*, 207 S. W. 89; *Sauvage* v. *Wauhop*, 143 S. W. 259.

See also Speer, Law of Marital Rights in Texas, 3d ed., p. 254:

"The status of the property of marital partners is determined by the time and circumstances attending its ' acquisition.' It is therefore helpful to keep in mind what is meant by ' acquired.' The term signifies the origin or inception of the right, rather than its later ripening or fruition."

[8] *Hugo* v. *Seffel*, 92 Tex. 414, 49 S. W. 369; *Boese* v. *Parkhill* (Civ. App.), 202 S. W. 120; *Pullman Co.* v. *Cox*, 220 S. W. 599, 602.

amounts paid her husband as compensation for his services in managing her properties and in negotiating the leases, and points to her agreement with her husband to that effect. Section 214 (a) (1) of the 1926 Act provides for a deduction from gross income of all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. The reasonableness of the amount paid as compensation and claimed as a deduction must be proved, and the burden of so doing is upon the claimant. *Memphis Linotype Printing Co.*, 9 B. T. A. 666; appeal dismissed, 34 Fed. (2d) 1022; *Toledo Grain & Milling Co.*, 62 Fed. (2d) 171; *L. Schepp Co.*, 25 B. T. A. 419. We have no evidence showing the amount paid petitioner's husband to have been a reasonable compensation or from which we could determine the reasonable value of his services. For lack of such evidence, without reference to the other statutory requirements, we disallow the deduction claimed.

The next issue relates to an allowance for depletion. Petitioner contends that, under section 204 (c) (2), of the Revenue Act of 1926 and section 114 (b) (3) of the Revenue Act of 1928 (the provisions of which are identical), she is entitled to deduct from her income, as depletion, 27½ per centum of the total bonuses received under the leases in each of the years when received.

That an allowance for depletion of bonuses received under a lease may be made under proper circumstances is well settled,[9] but, unless there is production from the leased property so that depletion is in fact sustained within the same taxable year as the receipt, the bonuses, as income, may not be reduced by an allowance for depletion. *Lizzie H. Glide*, 27 B. T. A. 1264, followed in *William E. Herring*, and *Eula Day Herring* memorandum opinions entered June 29, 1933; affd., 70 Fed. (2d) 785 and 70 Fed. (2d) 790; *J. T. Sneed, Jr.*, 30 B T. A. 1121. See also *Aubrey Umsted*, 28 B. T. A. 176; affd., 72 Fed. (2d) 328.

Here the parties have stipulated as follows:

At the time of execution of the several leases scheduled in Exhibit H to various portions of the Copper Mine Ranch and at the time of the receipt of bonuses therefor, there was no production of oil upon the particular acreage covered by such several leases, but from, and after July 12, 1926, there was oil produced continuously from the property known as the Copper Mine Ranch.

For the purpose of determining whether petitioner should be permitted to deduct an allowance for depletion from income received

---

[9] *Burnet v. Harmel, supra; Murphy Oil Co. v. Burnet,* 287 U. S. 299 : *Palmer v. Bender,* 287 U. S. 551; *Dakota-Montana Oil Co. v. United States,* 288 U. S. 459.

as bonuses on these several leases, they may be divided, from the list thereof in evidence, as follows:

1. Leases made either before or after discovery of oil on the Copper Mine Ranch; no production from the tracts so leased in taxable year in which bonuses therefor were received.

2. Leases under which production from the lands embraced was obtained in same taxable year when bonuses thereunder were received.

Following our decisions above cited we hold that no allowance for depletion may be deducted with respect to the bonuses upon leases falling in the first group, but that such allowance, the amount of which may be determined upon settlement, should be deducted with respect to the bonuses received under the leases in group 2. Respecting leases made after the discovery of oil on the ranch but under which no production was obtained in the year the bonuses were paid, petitioner argues that an allowance for depletion should nevertheless be made since there was production from " the property ", being the whole ranch, which, it is stipulated, was one tract. With this we disagree. The term " the property " applies to the particular acreage covered by each of the several leases. *Vinton Petroleum Co. of Texas*, 28 B. T. A. 549; affd., 71 Fed. (2d) 420.

The parties stipulate that the amount of state, county, and school district ad valorem taxes assessed and paid on the retained royalty interest totaled $7,692.92 in 1927, $9,197.23 in 1928, and $4,659.26 in 1929, and that petitioner was allowed to deduct only one half of these amounts in these years. In view of our decision that the royalty interest was the separate property of petitioner, the deduction of the entire amount of these taxes should be allowed. So also respecting expenditures totaling $7,652.99 in 1926, $8,044.32 in 1927, $5,833.36 in 1928, and $5,762.63 in 1929. Respondent has allowed as deductions in each of these years one half of the respective amounts, admitting that the whole thereof should be allowed should we hold (as we have done) that the leased properties were petitioner's separate estate.

Petitioner claims as a deduction from income for the year 1929, $12,500, being one half of the amount claimed as lost upon an obligation of the Power Banking Co., of Archer City, Texas. The stipulation respecting this transaction we have set out in full.

Petitioner makes no reference to any statutory provision under which she seeks the allowance of a deduction on this transaction. The pleadings refer to it as a " loss on a deposit " and since a relationship of creditor and debtor is established by the deposit of money in bank, we assume that the deduction is claimed as upon a debt determined to be worthless in whole or in part under section 23 (j) of the Revenue Act of 1928. Its provisions make the allowance

of a deduction from income for bad debts dependent upon satisfactorily meeting certain precedent requirements. As to debts claimed in their entirety, the taxpayer must ascertain them to be worthless and must charge them off. As to debts claimed only in part, the Commissioner "must be satisfied that the debt is recoverable only in part and until he is there can be no charge-off, and then only with his permission." But this ruling may be reviewed and reversed. if it appears that in disallowing the charge-off to be made he abused his discretion. *Liberty Bank & Trust Co.* v. *Commissioner*, 59 Fed. (2d) 320 (reversing 14 B. T. A. 1428).

We are of opinion that the charge-off should be made and deduction of the loss allowed. The fact that the bank was determined to be hopelessly insolvent would have been sufficient evidence of the worthlessness of petitioner's claim—see *Egan & Hausman Co.*, 1 B. T. A. 556; *John E. Saddler*, 2 B. T. A. 1305—had not petitioner been secured by the pledged certificates. But the then value of the certificates is stipulated—$35,000—and it was stipulated also that any recovery of petitioner's deposit could come only from them. That, we think, is a sufficient determination of petitioner's loss, for "the collateral security to a debt need not be liquidated to establish the worthless portion of the debt;" see *Ross* v. *Commissioner*, 72 Fed. (2d) 122, reversing 27 B. T. A. 1062), citing *Murchison National Bank* v. *Griscom*, 50 Fed. (2d) 1056. See also article 191 of respondent's Regulations 74, relating to the deduction of the uncollectible portion of a debt.

There should be deducted from petitioner's income one half the difference between the amount of the lost deposit and the stipulated value of the security, or $12,500.

It is further stipulated that petitioner's income for 1925 shall be reduced by $1,956.01 on account of the deduction allowable for interest paid, and that $12,262.32, being one half of an alleged profit from the sale of cattle, should be excluded from income for 1928. Effect to these agreements will be given upon settlement.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

ARUNDELL and LEECH dissent from the result reached on the issue involving depletion allowance.

SEAWELL dissents from the result reached on the issue involving compensation paid the husband for services rendered.