**FULCHER et al. v. YOUNG et ux.**

No. 9508.

Court of Civil Appeals of Texas. Austin.
July 11, 1945.

Rehearing Denied July 28, 1945.

Fred S. Dudley, of Fort Worth, for appellants.

Camp & Camp, of Cameron, for appellees.

McCLENDON, Chief Justice.

Suit by Minnie, Ventie and W. H. Fulcher, and Minnie Frances Hooker, as sole devisees and legatees under the will of Frank Fulcher, deceased, against Vess Young and wife, Elane, to cancel two deeds dated respectively September 19 and 20, 1938, and conveying to Mrs. Young (as her separate property) two tracts of land in Milam County of 52.5 and 5.75 acres, respectively, on the alleged grounds of mental incapacity of Frank, fraud and undue influence. The case was tried to a jury upon a single special issue: Whether Frank was of sound or unsound mind when he executed the deeds; and upon a finding that he was of sound mind, judgment was rendered for defendants. The plaintiffs have appealed, urging seven points of error. The first five of these complain of admission of testimony of George Peoples and A. R. Ramseur, detailing a conversation between Vess Young and John Wesley Moten, the husband of Hattie Moten, a sister of Frank; the sixth complains of admission of testimony of ten witnesses to the effect that Frank was of sound mind; and the seventh that the verdict was "so against the preponderance and overwhelming weight of the evidence as to be manifestly wrong."

We make the following general preliminary statement: Frank Fulcher appears to have been a negro of more than average intelligence. He could read and write, loved to discuss politics, read various political and other periodicals, was described by one witness as 100% Republican, though a New Dealer, but against the AAA because it restricted his cotton acreage so as to make cotton growing unprofitable. He died in December 1939, at the advanced age of about 86 years. This would place his birth year about 1853. He married in 1879; was divorced in 1895 and never remarried. There were several children, the record being silent as to the number. The land in suit was located in a negro settlement called Liberty Hill, a few miles east of Thorndale, in Milam County. He had acquired it before his marriage, and lived on it until about 1937. No issue of homestead was raised. In 1916 he borrowed $500 from a loan company, securing it by trust deed on the 52.5 acres. This loan was acquired by an insurance company, and was extended to mature January 1, 1937, at which time there was due, besides the principal, one interest coupon of $35. The insurance company being unwilling to extend the loan, it was taken up by Mrs. Young, with the verbal understanding that she would carry it a couple of years. About April or May, 1937 (one witness gave the date as 1935 or 1936, but this is unimportant), Frank had what is referred to as a stroke and went to live with his niece Bertie Cook and her husband, Roy Cook, in Rockdale; where he resided until May 1938, when he went to live with his sister Hattie Moten, at Grass Burr Hill, in the southeastern part of Rockdale. It was there that he executed the two deeds. In October or November 1938, Hattie moved to a house she had built in Key Flats, in the northeastern part of Rockdale, where Frank resided with her until he died in December 1939. While living with the Cooks, Frank applied for and was granted an old age pension, and received some three or four checks, beginning about January 1938, of $7 each. His pension was then cut off, on the ground of his ownership of the land in suit. After he sold the land he applied for reinstatement of his pension, which was granted about December 1938, and continued until his death, at first for $12 per month for three or four months, then reduced to $6 per month, on the ground of insufficient funds.

It was the theory of defendants, supported by allegation and proof, that after the pension was cut off and shortly before the deeds were executed, Frank sent his brother-in-law Moten to Mr. Young, importuning him to buy the land at once; that Young at first declined, referring Moten to Strauss, Manager of Thorndale Mercantile Co., holder of judgment lien on the property, who also refused to buy, and Young there-

upon, after obtaining an offer by Strauss to transfer the judgment for $150, consummated the purchase. At that time the judgment debt amounted to about $310, unpaid taxes on the land about $90, and the loan held by Mrs. Young about $630; in all about $1030. There was no proof of the value of the land. There was a stipulation that its rental value was $125 per annum; but its actual yield was not shown. The taxes for 1939 were $49.49, and for 1938 $42.46. It is quite apparent therefore that the current fixed charges against the property (interest and taxes) practically equaled the agreed rental value of $125. In the transaction Frank got all his debts paid and received $100 in cash, which, at his request, was paid to his sister Hattie.

The complained of testimony of Peoples is thus set forth in appellants' brief:

"There were four of us playing dominoes, Vess Young, Arthur Ramseur and me, when the negro man (Moten) came in and he walked up near Mr. Young and asked to see him privately, and Mr. Young said 'just go ahead and say what you want to say. It is all right with me.' I think the negro said he wanted to see him about selling that land of Fulcher's, and Mr. Young said, 'I don't want the land. You might sell it to Earl Strauss,' the manager of the Thorndale Mercantile Company. And the negro walked away, and he came back in a short while and walked around to Mr. Young, and Mr. Young said, 'Did you see him?' and he said, 'Yes, but he don't want to buy it.' And Young says, 'I don't want the land.' So the negro hesitated and said 'They wanted to see about it today; they want to sell the land,' so the negro walked off, and I don't think anybody asked Young about it, but Young said—."

Ramseur's testimony was not essentially different.

Prior to offer of this testimony Hattie Moten, appellants' only witness in chief, had testified that when Young and Mr. Camp (Attorney and Notary) came with the papers for Frank to sign, Young told her "he wanted to turn the land over to that boy William (one of the plaintiffs and a son of Frank), and wanted to give him a pension, and by the time they got the land straightened out and Sing (William) could work it, he might not have to get a pension. He wanted to give me some money to help get him on a pension and then turn the land over to the boy." The effect of this testimony was that Young procured the deed under the false representation that he was not buying the land for himself (his wife) but was merely helping Frank out and would turn the property over to William. The testimony of Peoples and Ramseur was offered expressly only on the issue of fraud, and but two objections were made to it in the trial court:

1. That it was hearsay, in that it was not shown that Moten was authorized to represent Frank; the elementary principle that agency may not be proved by declarations of the agent being invoked.

2. That the witnesses were incompetent under the "dead man's statute," Art. 3716, RCS, it being shown that Moten had since died.

■ As to the first objection it was stated at the time the testimony was offered that it would later be shown that Frank had sent Moten to Young and Strauss to try to sell them the land. This was later shown, Camp testified in this connection that Young and Moten came to his office together and instructed him to prepare the deeds; which he did, and in company with them and at their request went to the Moten home on Grass Burr Hill, and after deeds were signed Frank instructed Young to make the $100 check payable to Hattie. During the conversation Frank stated to Camp that he had sent Moten to Young and Strauss. This particular objection is manifestly unsound.

■ The second objection was to the effect that admission of the testimony constituted a circumvention of the statute in that both Moten and Frank were dead, Young was disqualified since defendants had made Frank's executor a party in his representative capacity, and the testimony was offered as a part of a transaction between Young and Frank.

No tenable theory is suggested upon which these witnesses were disqualified under the statute. Appellants' brief contains this statement: "The writer has found no case wherein the party to the suit, disqualified from testifying as to his transactions with a deceased person, indirectly established such transaction by a third party called by him as a witness." How else could such transactions be proved? If it were the law that a party to a suit may not prove transactions with a decedent by other witnesses who are not parties to nor interested directly or indirectly in the suit, then it would be impossible to prove any transac-

tion with a deceased person where proof thereof was dependent upon parol testimony. Such rule would have disqualified Hattie Moten as well as other witnesses of appellants. Neither Moten nor Peoples nor Ramseur was a party to the suit nor in any way interested therein. The latter two were clearly not disqualified by the statute.

■ There is another ground upon which the statute is inapplicable. The pleadings and agreed stipulations show conclusively that Frank left no estate, had no debts and no administration was had or was necessary upon his estate. No theory of pleading or proof was presented under which a judgment might properly have been rendered against the executor in his capacity as such. Although he was made a party by defendants in a cross-action to remove cloud from title, he had no interest in the property except in his individual capacity as legatee or devisee; as to whom the statute has no application. Newton v. Newton, 77 Tex. 508, 14 S.W. 157; Stiles v. Hawkins, Tex.Com.App., 207 S.W. 89. See also the recent case of Turner v. Pugh, Tex.Civ.App., 187 S.W.2d 598, for list of further pertinent authorities. However, it is not necessary to rest our decision upon this ground; and we do not do so for the reason that the case was tried upon the theory that the statute applied and none of the parties to the suit testified.

■ Appellants' brief urges the further objection to this testimony on the ground that it was immaterial to the only issue then before the jury, namely, the mental capacity of Frank, it being asserted that plaintiffs' evidence at that time raised no other issue, and the evidence neither showed nor tended to show Frank's mental capacity. As we have already shown there was some evidence then before the jury on the issue of fraud. We are not concerned with the sufficiency of such evidence to support that issue. But this aside, this objection was not urged in the trial court when the testimony was offered and therefore cannot be considered. Had appellants abandoned the issue of fraud when the evidence was offered they might have had it excluded upon this ground. Had they later abandoned the issue they might have had the evidence withdrawn upon motion for a like reason. Having pursued neither course they are precluded from complaining.

Point 6 complains of admission of the testimony of ten witnesses listed below "to the mental soundness" of Frank, "the testimony of each being so unrelated to the time the deeds were executed, (as) to render such testimony inadmissible to show or tend to show that the said Frank Fulcher possessed sufficient mental capacity to make the deeds at the time said deeds were executed."

■ It should be stated prefatorily that Hattie Moten had testified in substance that Frank was in a state of mental unsoundness from the time he was brought to her house on Grass Burr Hill (May 1938) until his death. At times he would not know her or other relatives; and he had constant illusions, being afraid of her Maltese cat, thinking it a dog. It is clear therefore that any testimony (otherwise pertinent) relating to any portion of that period would be admissible. The following are the ten witnesses whose testimony is complained of in the order they are listed in the brief. We shall not detail the testimony other than to show that it related to the time in question, which is the only ground of objection urged.

Ed Gunn was county attorney of Milam County and former justice of the peace and city attorney. He had known Frank since about 1915. Frank came to his law office in Rockdale occasionally on law business. Knew him after he came to Rockdale, to the best of his recollection during 1937. Consulted with him about his old age assistance. Believed it was about the time they cut him off. Met him many times after that—along in 1937 and 1938. The main point urged against the testimony of this witness was that he stated he believed Frank's brother John was with him when witness would see Frank on the street. In this connection Hattie Moten testified later in rebuttal that John died in 1926. Conceding that the witness may have been mistaken as to when he saw John with Frank, his testimony was clear and unshaken that he consulted with him about the time his pension was cut off. That was about the time he went to Hattie's in May 1938, or shortly before.

W. J. Lee was constable at Rockdale. He had known Frank 40 years or more, since witness was about 6 years old. Talked to him three or four times a week as long as he was able to be around; saw him and talked to him after he moved to town—once after he got sick.

Jack Shields, 83 years old, resident of Rockdale 65 years, had known Frank for about 50 years. They were pretty good

friends. Had frequent association with him both before and after he moved to Rockdale; visited him frequently at Grass Burr Hill, and two or three times at Key Flats, the last time about two months before he died.

Wither McKee was a deacon in the Methodist church of which Frank was a member. He visited with Frank frequently at Grass Burr Hill and later at Key Flats.

Roy Cook was Frank's nephew by marriage. Frank lived with him from the time he moved to Rockdale in April or May 1937 until he moved to Hattie's. Witness saw and talked with him at Grass Burr Hill and later at Key Flats.

Justice Alford was in the business of trading in mules, cattle and hogs. Had known Frank a number of years. Saw him once and conversed with him at Key Flats.

Bose Moultrie was a blacksmith, specializing in horseshoeing, 37 years a resident of Rockdale. Frank frequently visited his shop; loved to read and talk; would sit and talk for hours. This is the witness who described Frank as a politician, 100% Republican and New Dealer. He visited Frank two or three times at Grass Burr Hill.

H. H. Pruett was superintendent of public schools at Milano. He was also in the business of feeding and shipping hogs. He had a hog feeding pen adjoining the lot on which Hattie built her house at Key Flats, and made arrangements with her to dig a well on her lot from which he would water his hogs. He fed hogs there during the time Frank lived at Key Flats and he saw and conversed with Frank frequently during that period.

Reuben Kaywood was a discharged World War veteran, and worked for Pruett feeding and watering his hogs at Key Flats, and had frequent conversations with Frank, during the same period testified to by Pruett.

Frank Cummings was a negro barber, had known Frank for about 25 years. His testimony covered the period before Frank moved to Rockdale and while he lived with Roy Cook, but not after he moved to Grass Burr Hill.

We do not think the testimony of any of these witnesses was subject to the objection made. Its weight and probative value were factual issues for jury determination. The following among other authorities support this view: Thornton v. McReynolds, Tex.Civ.App., 156 S.W. 1144, error refused; Missouri Pacific Ry. v. Baldwin, Tex.Civ.App., 261 S.W. 418, affirmed, Tex.Com.App., 273 S.W. 834; Small v. Taylor, Tex.Civ.App., 54 S.W.2d 151; Davis v. Williams, Tex.Civ.App., 144 S.W. 2d 445, error dismissed. It is held in these and other cases that the question whether a non expert witness has shown himself qualified to express an opinion as to one's sanity is largely a question of discretion of the trial judge. The following general statement is quoted from 24 Tex.Jur., p. 417, § 37:

"While in any proceeding involving the question of mental condition, the proof must be directed to the condition as it existed at a particular time, such condition may be proved by evidence of the state of the person's mind at other—and especially at prior—times. With respect to the remoteness of the time to which the investigation may reach, it has been said to be impossible to fix a general limit that will control in all cases. The question would seem to be one of degree only; the farther off the evidence is carried, the weaker it may be, but it is still evidence and should be considered."

The seventh and last point, that the jury finding that Frank "had sufficient mental capacity to execute the deeds in question was so against the preponderance and overwhelming weight of the evidence as to be manifestly wrong," requires little discussion. Except in proceedings to probate wills, in which there is a statutory requirement for affirmative proof of the testator's mental capacity to execute the will, there is a general presumption of sanity or mental capacity, and the burden rests upon one relying upon want of mental capacity to prove that fact. 24 Tex.Jur., p. 415, § 35. The only witness in chief offered by appellants was Hattie Moten. She was by no means an unbiased witness, and her testimony was subject to a number of criticisms, which need not be noted. The only corroborating testimony was that of her daughter, who lived in Austin, and Bertie Cook, the divorced wife of Roy Cook. These two witnesses testified in rebuttal.

On the other hand, in addition to the ten witnesses above, Mr. Camp, a practicing lawyer of 35 or 40 years, who drew the deeds and took Frank's acknowledgment thereto, testified that he had known Frank well since witness was a little boy. He tes-

tified generally to Frank's mental capacity, and particularly at the time he executed the deeds, and that he would not have taken the acknowledgments had there been anything to indicate mental incapacity. His testimony is in sharp conflict with that of Hattie Moten in a number of material respects. If the evidence may properly be said to overwhelmingly preponderate on either side, it would be on that of Frank's mental capacity and not of his mental incapacity.

The trial court's judgment is affirmed.

Affirmed.